**PLACID OIL COMPANY et al.,
SoLa II, Petitioners,**

v.

**FEDERAL POWER COMMISSION,
Respondent.**

**No. 71–2761.**

United States Court of Appeals,
Fifth Circuit.

April 16, 1973.

As Amended on Denial of Rehearing
June 11, 1973.

884

Paul W. Hicks, Dallas, Tex., Robert W. Henderson, Donald K. Young, Dallas, Tex., William J. Grove, Washington, D. C., J. P. Hammond, Tulsa, Okl., for petitioners.

Richard V. Mattingly, Jr., Gordon Gooch, Gen. Counsel, Leo E. Forquer, Sol., J. Richard Tiano, First Asst. Sol., William P. Diener, Asst. Sol., F. P. C., Washington, D. C., for respondent.

Thomas G. Johnson, Houston, Tex., for intervenor Shell Oil Co.

Martin N. Erck, John R. Rebman, Houston, Tex., for intervenor Humble Oil & Ref. Co.

Robert F. LeBlanc, R. J. Leithead, Tulsa, Okl., for intervenor Cities Service Oil Co.

Richard F. Generelly, Francis H. Caskin, Washington, D. C., for intervenors Callery Properties, Inc. and others.

William O. Strong, III, John E. Watson, Houston, Tex., for intervenor Tenneco Oil Co.

William A. Sackmann, Findlay, Ohio, for intervenor Marathon Oil Co.

Frank P. Saponaro, Jr., Washington, D. C., for intervenor Superior Oil Co.

Ronald J. Jacobs, Tulsa, Okl., for intervenor Skelly Oil Co.

B. James McGraw, Warren M. Sparks, Tulsa, Okl., for intervenor Gulf Oil Corp.

Stanley M. Morley, Washington, D. C., for intervenor Sun Oil Co.

Homer D. Johnson, William C. Charlton, Pampa, Tex., for intervenor Cabot Corp.

John M. Young, J. Donald Annett, Kirk W. Weinert, Houston, Tex., for intervenor Texaco, Inc.

Tom Burton, Houston, Tex., for intervenor Continental Oil Co.

Derrill Cody, Willard P. Scott, Oklahoma City, Okl., for intervenor Kerr-McGee Corp.

Frederick Moring, Washington, D. C., for intervenor Associated Gas Distributors.

C. William Cooper, Hartford, Conn., William Warfield Ross, Washington, D. C., Tilford A. Jones, Bethesda, Md., for intervenor United Distribution Co.

Edward J. Kremer, Dallas, Tex., Charles E. McGee, Washington, D. C., for intervenor Atlantic Richfield Co.

Edwin S. Nail, Tulsa, Okl., for intervenor Amerada Hess Corp.

Neal Powers, Jr., Houston, Tex., for intervenors Freeport Minerals Co., U. S.

Oil Co. of La., Inc., U. S. Oil of La., Ltd., John W. Mecom, Lake Washington, Inc. and E. Cockrell, Jr.

Justin R. Wolf, Washington, D. C., Woollen H. Walshe, New Orleans, La., for intervenor The California Co.

Richard F. Remmers, Oklahoma City, Okl., for intervenor Sohio Petroleum Co.

Dee H. Richardson, George C. Bond, Los Angeles, Cal., for intervenor Union Oil Co. of Cal.

John L. Williford, Kenneth Heady, Bartlesville, Okl., for intervenor Phillips Petroleum Co.

Lange Hoffman, Houston, Tex., for intervenor Pennzoil Producing Co.

Jerome J. McGrath, Washington, D. C., for intervenor Independent Natural Gas Assn. of America.

Clyde E. Willbern, Houston, Tex., for intervenor Getty Oil Co.

Sherman S. Poland, Washington, D. C., H. H. Hillyer, New Orleans, La., for intervenor The Louisiana Land & Exploration Co.

Murray Christian, Herbert W. Varner, Houston, Tex., for intervenor Superior Oil Co.

Cecil N. Cook, Houston, Tex., for intervenor E. Cockrell, Jr., etc.

John T. McMahon, Houston, Tex., for intervenor Ashland Oil, Inc.

Frank W. Frisk, Jr., Washington, D. C., for intervenor American Public Power Assn.

Edward Berlin, Washington, D. C., for intervenor Consumer Federation of America.

Reuben Goldberg, Charles F. Wheatley, Jr., Washington, D. C., George E. Morrow, Memphis, Tenn., for intervenor Municipal Distributors Group.

Raymond N. Shibley, Washington, D. C., for intervenor Pipeline Purchasers.

T. C. McCorkle, Tulsa, Okl., for intervenor Amoco Production Co.

Tom P. Hamill, Houston, Tex., Carroll L. Gilliam, Washington, D. C., for intervenor Mobil Oil Corp.

Michael H. Rosenbloom, Washington, D. C., Joseph J. Klovekorn, Albany, N. Y., for intervenor Public Service Comm. of N. Y.

George Spiegel, James F. Fairman, Jr., Washington, D. C., for intervenor Fuels Committee of Fla. Mun. Utilities Assn.

Before JOHN R. BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Today we must decide if what FPC has said—in response to what we said about what FPC said about what the Supreme Court said—is supported by "substantial evidence on the record as a whole". In short, we must review FPC Op: 598 which undertakes to establish the "just and reasonable" rates at which natural gas producers may sell gas in the Southern Louisiana Area (SLA). This followed in the footsteps of our Austral Oil Co. v. FPC, 5 Cir., 1970, 428 F.2d 407, which we now denominate as *SoLa I* in the almost certain assurance that what we write today will be known far and wide as *SoLa II*, and with the hope—for which there is no such assurance—that there will be no *SoLa III*, or *IV*, or *V*.

I. Area Rate Regulation in Perspective

Nearly twenty years have elapsed since the Supreme Court, in *Phillips I*,[1] first held that it was incumbent upon FPC to regulate the well-head sales by producers of natural gas to interstate pipelines. For six years FPC wandered frantically in its attempt to regulate each producer individually. Realizing that its resources were being exhausted more rapidly than the gas under scruti-

---

1. Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (*Phillips I*).

ny with little to show for it, FPC, in *Phillips II*,[2] decided to abandon the individual producer method of rate regulation and to invoke its rule-making powers to establish area-wide rate ceilings for the industry as a whole. Accordingly, it established seven geographically identifiable producing areas and commenced its formidable task.[3]

The first efforts of FPC to establish rates for the SLA reached fruition in Op: 546. After an extensive review in this Court, we decided—largely because of the fact that area rates were an "experiment" for FPC, and in spite of our very serious reservations about the adequacy of FPC's conclusions (particularly its fail-

ure to assess the probable consequences of its action in terms of supply and demand)—to affirm Op: 546. *SoLa I:* 428 F.2d 407. But our opinion on rehearing, 1970, 444 F.2d 125, cert. denied sub nom. 1970, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257, was very significant. Charting the parameters of that decision is therefore a prerequisite to effective review of this case. For we must determine whether, as FPC would have us believe, what we said must happen is really what we got.

## II. Mandate of SoLa I

Op: 546, reviewed by this Court in *SoLa I*, followed the *Permian*-approved

---

2. See Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (*Phillips II*).

3. FPC has now completed its proceedings for six of the seven areas. The status of these proceedings are as follows.

 (1) *Southern Louisiana Area.* The first SLA Rate Case (*SoLa I*) culminated with Op: 546, affirmed on review, SLA Rate Cases (Austral Oil Co.) v. FPC, 5 Cir., 1970, 428 F.2d 407, on rehearing, 1970, 444 F.2d 125, cert. denied sub nom., 1970, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257. The provisions of Op: 546 were superseded, however, by Op: 598. This Opinion and the resulting order are the subject of this Appeal.

 (2) *Permian Basin Area.* FPC's rate regulations for this area were sustained by the Supreme Court in Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312. FPC has continued its efforts for this area in a subsequent round.
 *Permian II*, FPC docket no. AR 70–1, 45 F.P.C. 192 (1971), is now awaiting an initial decision by the Administrative Law Judge.

 (3) *Hugoton-Anadarko Area.* Op: 586 promulgating rate ceilings for this area was recently sustained by the Ninth Circuit. Hugoton-Anadarko Area Rate Case: California v. FPC, 9 Cir., 1972, 466 F.2d 974.

 (4) *Texas Gulf Coast Area.* Op: 595 now pending review in D.C.Circuit.

 (5) *Other Southwest Area.* Op: 607 now pending review in Fifth Circuit. docket no. 72–1114, Argued March 27, 1973.

 (6) *Appalachian and Illinois Basin Area.* Op: 639 now pending review in Fifth Circuit.

 (7) *Rocky Mountain Area.* Proceedings to establish maximum permissible rates for the seventh producing area are currently underway in FPC docket no. R–425. See Phillips Petroleum Co. v. FPC, 10 Cir., 1973, 475 F.2d 842 [No. 71–1659].

 In addition to its rule-making powers under §§ 5 and 16 of the Natural Gas Act, FPC has also wielded its certificating powers under § 7 to keep the prices "in line" pending resolution of the area rate cases. See CATCO (Atlantic Refining Co. v. Public Service Commission of New York), 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312; United Gas Improvement Co. v. Callery Properties, 1965, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284; FPC v. Sunray DX Oil Co., 1968, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388. The exact relationship between its § 5 rules and its § 7 rules is, as yet, largely undecided. It does appear, however, that FPC will use both powers in a complementary manner to achieve its objectives of eliciting an additional supply and establishing greater rate stability. See FPC order No. 455, "Statement of Policy Relating to Optional Procedure for Certificating New Producer Sales of Natural Gas," 18 C.F.R. § 2.75 (August 3, 1972). Subsequent to the printing of this opinion the Court became aware that Op: 658 partially setting rates for the Rocky Mountain Area was issued on April 11, 1973. FPC has apparently also decided to issue national rates which pre-empt these area determinations under its rule-making power in its Docket No. R–389B. See Foster Associates Report No. 891 (April 12, 1973).

method of a multi-tiered rate structure. Thus, the permissible rate varied from 17.0¢/Mcf to 20.0¢/Mcf,[4] depending, as with wine, on the vintage of the gas— the only difference being that the newer, or newest, gas was the most dear. The theory behind this multi-tiered system was that a greater price had to be allowed for new gas. This was because its cost had to include an increment to account for the need for committing new reserves to the interstate market, and also because in the economic situation of the day, gas had achieved a greater value than before. Thus, in determining the cost per Mcf, the flowing gas costs were determined from historical data for SLA. The theory was that the rate ceilings should be adjusted to allow for recoupment of these costs. The costs for new gas, on the other hand, were based upon nationwide data and a 12% rate of return. To insure rate stability in the immediate future FPC ordered a

4. The Court described the Op: 546 rate structure:
 "(1) The Rate Structure
 The Commission repeated in Southern Louisiana the multiple rate structure it had introduced in *Permian*, this time setting three different price levels for what it denominated as first, second, and third vintage gas. For first vintage gas, that for which contracts of interstate sale had been made prior to 1961, the Commission set a ceiling of 18.5 cents per thousand cubic feet (Mcf). For second vintage gas, that contracted for between the dates of January, 1, 1961, and October 1, 1968, it set a ceiling of 19.5 cents. For third vintage gas, that contracted for after October 1, 1968, it set a ceiling of 20 cents. For offshore gas in the federal domain, which is not subject to the Louisiana severance tax, it set prices for each of the three vintages 1.5 cents below onshore levels. For casinghead gas (gas produced in association with oil), the Commission set prices equal to those of first vintage gas irrespective of the vintage. The Commission found that casinghead gas is discovered largely as a by-product of the search for oil and exploration for it thus could not be encouraged by the higher prices of second and third vintage gas.

 "The price structure thus established is summarized in the following chart:"

 | Vintage or Type | Onshore Price | Offshore Price |
 | --- | --- | --- |
 | First vintage | 18.5 cents | 17.0 cents |
 | Second Vintage | 19.5 cents | 18.0 cents |
 | Third Vintage | 20.0 cents | 18.5 cents |
 | Casinghead | 18.5 cents | 17.0 cents |

 *SoLa I:*419
 The unit cost used to establish these rates was as follows:

 | Item | New Gas | Flowing Gas |
 | --- | --- | --- |
 | Exploration and Development | 4.14 | 4.17 |
 | Production Operating Expense | 2.70 | 1.93 |
 | Liquid Credit | (3.30) | —— |
 | Depletion, Depreciation, Amortization | 4.04 | 3.19 |
 | Return on Investment | 5.33 | 5.17 |
 | Return on Working Capital | 0.35 | —— |
 | Regulatory Expense | 0.15 | 0.17 |
 | Royalty | 2.24 | —— |
 | Area Gathering | 0.51 | 0.51 |
 | Production Tax | 2.30 | 2.30 |
 | TOTAL | 18.80 | 18.36 |

 All figures given are unit costs, in cents per Mcf. The grouping of flowing gas costs is different from that for new gas; the flowing gas E & D computation, for example, contains some allowance for rate of return.
 *SoLa I:*420 n.23

five year moratorium on increased rate filings above the rate set by Op: 546. FPC also ordered substantial refunds.[5]

Op: 546 was challenged by both consumer and producer interests. Nearly every feature of the plan was assaulted. Except for its statutory advocate, the general counsel, scarcely a good word was said of Op: 546. The battle raged over two claims. The consumer interests argued that FPC had unlawfully padded the rate with non-cost items. On the other hand, the counter-contention of the producers was that FPC had failed to adequately take account of the severe shortage in the supply of natural gas reserves and the importance of price when it established the rates. As to non-cost factors which are clearly labeled and justified, we held that they may be used to further the overall purposes of the regulatory undertaking:

> Non-cost factors may be used to influence market variables such as supply and demand, to create price stability, to influence industry structure, to simplify a rate schedule, and for many other purposes, but only if they are clearly identified and explained.

*SoLa I:* 441

As to the acute shortage of gas, we expressed great disappointment that FPC had failed to consider the proposed rates in terms of the effect which they might have on our nation's supply of natural gas. This inescapably is a matter of gas reserves. Realizing that FPC might want to rectify this omission in its future consideration of the appropriate rates for SLA, we took careful pains, especially in the opinion on rehearing, to make sure that our affirmance of the Op: 546 rate structure would not impair FPC's authority to formulate a more flexible plan if the need arose. *SoLa I:* 444 F.2d 125.

■ Of course, *SoLa I* was also very instructive as an indication of the stand-ard of review which this Court should, in the post-*Permian* era, employ in reviewing rate determinations by FPC. Realizing that "FPC must evaluate each rate set against policies as broad as the Natural Gas Act itself," *SoLa I:* 435, and that area rate regulation was still in the "experimental" stage, we continued the very flexible, but realistic, standard established by *Permian:*

> The *Permian* decision thus indicates that a reviewing court must look to both individual components and overall effect of rates set by the Commission, but that the Commission has broad discretion that is not to be ineffectuated by either theoretical disagreement with its methods or by discovery of inadequacies that are caused mainly by the difficulty of the regulatory undertaking. The Commission is to be affirmed if it has followed the correct legal standards and acted on the basis of substantial evidence, and under any fair interpretation of *Permian* it appears that the legal standards themselves are to be construed liberally when applied to a regulatory effort still in the experimental stage. This "experiment" doctrine, together with the substantial evidence rule, is background for our consideration of most of the issues presented on this appeal.

*SoLa I:* 418

The steps which a reviewing court must take had been quantified with even greater particularity in *Permian* itself:

> \* Section 19(b) of the Natural Gas Act provides without qualification that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." More important, we have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of

---

5. The refund obligations were calculated on the basis of the difference between the first and second vintage rates established by Op: 546 and the actual rates collected by the producers subject to refund. They totaled approximately $375,000,000 for the entire SLA.

A system of quality adjustments and special exemptions was also established by FPC. See *SoLa I:* 421 n. 25

validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." FPC v. Hope Natural Gas Co., supra, [320 U.S.] at 602, [64 S.Ct. 281] 88 L.Ed. [333] at 345. We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." Ibid.

Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a "zone of reasonableness." FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 743, 86 L.Ed. 1037, 1049. No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests.

The Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336.[6]

■ Does the "experiment" rationale of Permian and *SoLa I* still warrant a kid glove review of FPC rate cases? We think that it does. Cast in the perspective of the human travail, some might say that the dozen year experience with area rate regulation should arguably justify a holding that the experimental phase has passed. In 1971, when Op: 598 was written, however, FPC had only twice been the beneficiary of the judicial function to declare "what the law is". No one can honestly say that judges have been any more sure than commissioners, as all struggle with a problem that grows out of the peculiar mixture of a simultaneous service and exhaustion of a depletable asset. All have been groping. The day for groping is not yet over. And it does not denigrate what FPC has done to say that much may yet be imperfect and much remains to be done or redone. So we can find that FPC has conscientiously attempted to establish "just and reasonable" rates within the framework allowed by judicial precedent, yet, it is still experimenting.

---

6. The four elements which delineate the scope of a reviewing court's authority, thus presented, are as follows: (i) the well-known statutory "substantial evidence" standard, (ii) a judicially recognized "presumption of validity" implied from the congressional limitation, (iii) the long-standing "total effect" test of FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, and (iv) a "zone of reasonableness" to compensate for the necessarily imprecise nature of cost determinations and the inherent difficulty of the regulatory undertaking. Having thus prescribed the extent of its powers, *Permian* proceeded to outline the breadth of its duty:

It follows that the responsibilities of a reviewing court are essentially three. First, it must determine whether the Commission's order, viewed in light of the relevant facts that of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. *Permian, supra* at 791–792, 88 S.Ct. at 1373, 20 L.Ed.2d at 350.

FPC has approached the polycentric problem of area rate regulation with commendable flexibility. But its efforts are perforce an experiment. To those who deplore this lack of certitude, it is worth remembering that we have seen the Fourth, Fifth, Sixth and Fourteenth Amendments come alive in the short span of a couple of decades.

 But we emphasize that we will not allow the kid glove to hold a rubber stamp. One of the basic holdings in *SoLa I* was that non-cost factors are, or may be, a proper element of rate structure if they are clearly labeled and justified on the basis of "substantial evidence on the record as a whole". They may not be used, however, as thumbs-on-the-scale to compensate for inaccurate calculations. In *SoLa I*, we cautioned:

"The gas industry * * * requires a constant infusion of entrepreneurship of the highest order if even basic public needs are to be satisfied * * * we count upon persons who carefully weigh investment risks for our supply of natural gas. We think the Commission here, having calculated the dangers involved in allowing the gas supply to lapse, and the probabilities that its estimates might be too low, is justified in having added the small non-cost factors it thought were necessary. It found that it needed to do so to protect the public interest and not to assure any rights of gas producers. However, * * * the use of non-cost factors to allow for possible inaccuracies is not favored. Inaccuracy, if that is *really* the concern (and not higher costs), can result in a windfall to producers as easily as in a loss. We approve the use of non-cost factors for this purpose under the facts of this case only."

*SoLa I:* 426 n. 46

Of course, this is not to suggest that we hold FPC to any certain degree of mathematical accuracy. "There is nothing in the substantial evidence rule that pre-vents the Commission from performing calculations based upon necessarily imperfect assumptions when it explains the reasons for those assumptions. Likewise, there is nothing to prevent it from re-examining and adjusting the result of a calculation based upon imperfect premises, provided it justifies its actions on the basis of the record." *SoLa I:* 423. Indeed, we share Judge Breitenstein's distaste for the vagaries of rate calculations as he struggled for a beleaguered Tenth Circuit in *Permian*:

"The assumptions, allocations, formulae, equations, averages, means, and massive calculations may intrigue a mathematician or statistician but they have no attraction for us. We respectfully decline to be drawn into such a turmoil of numbers. We cannot in a few months unravel the snarl of statistics developed in the years of hearings. In our opinion, the judicial process, in cases such as this, should be confined to consideration of errors of law. We leave to the experts the selections of source material and the calculations to be made therefrom. Our concern is with the result."

Skelly Oil Co. v. FPC, 10 Cir., 1967, 375 F.2d 6, 24, aff'd., The Permian Basin Area Rate Cases, 1968, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312.

### III. Opinion 598

Coincident with its issuance of Op: 546, reviewed by this Court in *SoLa I*, FPC began a second round of rate proceedings for SLA to update, as might be appropriate, developments since the close of that then very stale record. On this basis, taking the admonishments of this Court [7] to heart and its authority [8] to hand, FPC after the affirmance of *SoLa I* reopened its consideration of the "just and reasonable" rates for all gas produced in SLA past, present, and future. By administrative order, FPC consolidated the revived *SoLa I* proceeding with the new *SoLa II* proceeding and brought forward the entire record. But it did not stop there. During the course

---

7. SoLa I: 428 F.2d 407.

8. See SoLa I: 444 F.2d 125 (on rehearing).

of subsequent hearings before the Examiner, whose position has now been elevated to Administrative Law Judge, a total of 7831 pages (57 volumes) of testimony was heard from 59 witnesses and 111 new exhibits were received into evidence. And yet, with these countless words, charts, diagrams, opinions, projections and estimates, we are told that the record is inadequate! But whatever its deficiencies, with this expansive record before it, FPC then adopted, via Op: 598, the rate structure presented in a proposed settlement agreement.

As it strived to bring its tortuous odyssey of rate-making in SLA to an end, FPC fixed its course for the public weal. Realizing that the stimulation of private entrepreneurs to develop SLA's most precious resource would be a difficult task, FPC determined at the outset, not only to use a flexible approach, but also to jettison the formalistic, legalistic, unworkable rigidity of a typical utility basis:

11. Our duty is to take all the action we believe necessary to reverse a downtrend of the exploration and development effort, thereby to increase the likelihood of augmenting the national inventory of proved reserves of natural gas. We would be derelict—we can think of no softer word—if we were to be guided by the legalisms of the past in seeking solutions to the problems which have grown like barnacles as this case has aged and its size has mounted. As far as we are concerned, in the prescription of just and reasonable rates, Opinion Nos. 546 and 546–A now perform no office.

Op: 598, ¶ 11.

FPC adopted a total rate structure to motivate private producers to fully develop SLA's resources. The trifaceted incentive program established by FPC in Op: 598 has been likened by Amoco to a three-legged stool. At the onset the rates themselves were adjusted upward from the *SoLa I* figures. Then, a stipulated refund obligation which was significantly lower than that imposed in *SoLa I* and a program to work-off the

refund obligations by committing additional new reserves to interstate sales was implemented. Finally, automatic periodic escalations and further escalations contingent upon the dedication of new reserves to the jurisdictional market were adopted. In synthesis, it looks like this:

a. *Ceiling Prices*. The following ceiling prices are prescribed:

(1) For Contracts Dated Prior to October 1, 1968:

| | |
|---|---|
| Onshore | 22.375¢ |
| Offshore | 21.375¢ |

(2) For Contracts Dated On or After October 1, 1968:

| | |
|---|---|
| Onshore | 26.0¢ |
| Offshore | 26.0¢ |

b. *Periodic Escalations of Ceiling Prices*. The ceiling prices applicable to contracts dated prior to October 1, 1968, shall escalate by one-half cent (0.5¢) per Mcf on October 1, 1973.

The ceiling prices applicable to contracts dated on or after October 1, 1968, shall escalate by one cent (1.0¢) per Mcf on October 1, 1974.

c. *Contingent Escalation of Ceiling Prices*. [For gas under contracts dated prior to October 1, 1968] when new gas reserves dedicated to the interstate market total 7½ trillion cubic feet of gas reserves in the Southern Louisiana area prior to October 1, 1977, the ceiling prices then in effect shall be increased by one-half cent (0.5¢) per Mcf.

Further successive increases of one-half cent (0.5¢) per Mcf in the ceiling prices shall be made when a total of 11¼ trillion cubic feet of new gas reserves have been committed to jurisdictional sales prior to October 1, 1977, and again when 15 trillion cubic feet of such new gas reserves have been committed to jurisdictional sales prior to October 1, 1977.

d. *Refunds*. Refunds in the total amount of $150,000,000 shall be made provided that any company having a refund *obligation may reduce such ob-*

ligation by one cent (1.0¢) for each Mcf of new gas reserves committed to a jurisdictional market in Southern Louisiana. Any new gas reserves used for the purposes of reducing refund obligations shall not apply in computing the contingent escalations prescribed above.

Amoco's chief objection is that it does not receive an equal portion of all three legs. We deal with this contention in great detail, *infra*, but for metaphorical integrity we must say at this point that every producer, including Amoco, benefits from at least two of these incentives. Under the Natural Gas Act, FPC has done its job, and done it well, if the rate structure which it adopts allows every producer of natural gas in SLA to stand on his own two legs!

Op: 598 employed the *Permian*-approved, multi-tiered vintage rate structure. But whereas FPC had established three "vintages" of rates in Op: 546, in Op: 598 it simplified the approach to a two-tiered structure. Under the new structure, "flowing" or "old" gas [9] may be sold for 22.375¢/Mcf (onshore) or 21.375¢/Mcf (offshore). This increase in rate, hotly contested on this appeal, was coupled with the automatic and contingent escalations and a decrease in the amount of refunds from approximately $375,000,000 to a stipulated $150,000,-000.[10]

Based upon its self-professed inexact calculation of the cost (including a projected rate of return of 15%) which we discuss in much greater detail *infra*, FPC determined that the maximum permissible price for all new gas, i. e., gas committed under the terms of a post-October 1, 1968 contract—whether produced on or off shore [11]—was 26¢/Mcf.

### The Propriety of Adopting a Proposed Settlement Agreement

The rate structure finally approved by FPC in Op: 598 actually originated as a proposed settlement agreement. It was

---

9. Actually, it is a misnomer to speak of "old" gas. The maximum permissible rate is contingent upon the date of the contract for the sale of the gas. Under the terms of Op: 598, gas contracted for prior to October 1, 1968, is subject to the above ceilings. Of course, given the fungible nature of gas and the fact that a quantity of gas is rarely—if ever—severed and identified for a particular contract, the quantitative demands of the old contracts may be satisfied from a supply reaped from a 1972 well just as easily as from a pre-1968 well. Actually, then, the first vintage rates established by Op: 598 are those maximum rates which may be charged for either old or new gas delivered under the terms of an *old gas contract*.

Perhaps it would be possible to make a more exact allocation of expenses, particularly for exploration and development, if the changes in rates varied—not according to the date of the contract—but rather according to the date on which the well was drilled or the gas was pumped. But that is an administrative, not a judicial, decision. Under our limited scope of review, we must confine our inquiry to the question of whether the choices made by FPC are supported by "substantial evidence on the record as a whole." Recognizing this limitation upon our duty and authority, we will scrutinize the various rates on the basis of their success *vel non*

in accomplishing the desired end result of the regulatory process.

10. In Op: 546, FPC had established three "vintages" of gas. The ceiling price for gas committed under a pre-1961 contract was 18.5¢/Mcf (onshore) or 17.0¢/Mcf (offshore), and the ceiling price for gas committed under a contract signed between January 1, 1961, and October 1, 1968, was 19.5¢/Mcf (onshore) or 18.0¢/Mcf (offshore). All post-October 1, 1968 or "new" gas was subject to a third vintage rate of 20.0¢/Mcf (onshore) or 18.5¢/Mcf (offshore) In *SoLa II*, FPC decided to make only one vintage rate for all pre-October 1, 1968, or "flowing" gas.

11. Under the *SoLa I* rate scheme there was a 1.5¢/Mcf disparity between the price of onshore and offshore gas. The higher price is allowed for onshore gas to permit the producer to pay the state of Louisiana 2.3¢/Mcf severance tax. Because the 1.5¢/Mcf difference under Op: 546 did not exactly correlate to the amount of the tax, several petitioners suggested that there was a .8¢/Mcf "phantom" tax. Recognizing that several other factors might materially affect the cost of offshore production and warrant a greater per unit rate absent the tax, we categorically rejected this notion in *SoLa I*: 425 n. 43.

offered as such by UDC, a consumer oriented group of distributors. Although the lack of unanimity of support from some of the various parties precluded the possibility of its functioning as a settlement in the traditional sense, FPC adopted it as a decision on the merits.

No one seriously doubts the power—indeed, the duty—of FPC to consider the terms of a proposed settlement which fails to receive unanimous support as a decision on the merits. We agree with the D.C. Circuit that even "assuming that under the Commission's rules [a party's] rejection of the settlement rendered the proposal ineffective *as a settlement,* it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits."* Michigan Consolidated Gas Co. v. FPC, 1960, 108 U.S.App.D.C. 409, 283 F.2d 204, 224, cert. denied sub nom. Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 1960, 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227; Cf. Pennsylvania Gas & Water Co. v. FPC, 1972, 150 U.S.App.D.C. 151, 463 F.2d 1242; Amoco Production Co. v. FPC, 10 Cir., 1972, 465 F.2d 1350; Cities of Lexington, etc., Ky. v. FPC, 4 Cir., 1961, 295 F.2d 109. If there was ever an area in contemporary socio-economic problems in which the snail-like pace of a transplanted Article III Case and Controversy is inadequate, this endless struggle for solution through the proliferation of administrative orders and judiciary appeals is surely it. Ironically, while Rome burns, the gas has gone out. If—and the *IF* gets bigger every day—the country is to solve this problem, it has to be done by adjustment, compromise, give and take. FPC settlements are therefore to be encouraged.

FPC was conscious of its role. It specifically held that the proposal's "wide support helps to provide stability in prices in the area and relieve the administrative burden of the Commission, and to reduce the probabilities of future liti-

gation." Op: 598 ¶ 39. Certainly consumers were involved. UDC is a coalition of 32 major distribution companies representing approximately 25% of the gas distribution in the United States and serving about 10.3 million customers at retail.[12] The proposal was also supported by Associated Gas Distributors (AGD), *all* interstate pipelines purchasing gas from SLA, and 46 natural gas producers comprising 80% of the total gas production in the area. Obviously, this broad base of support was an important consideration for FPC.

The objectivity of the settlement proposal comes not only from its advocates but also from its opponents. The proposal was, and is, stridently opposed by two very much aggrieved producers, Amoco and Mobil, and two consumer champions, The Municipal Distributors Group (MDG) and the highly vocal New York Public Service Commission (NYPSC). The presence of such vigorous combatants gives some assurance that the proposal could not have been accepted without consideration, both pro and con, of all sides of the problem.

As it should FPC is employing its settlement power under the APA, 5 U.S.C.A. § 554(c), and its own rules 18 C.F.R. § 1.18(a), to further the resolution of area rate proceedings. If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by "substantial evidence on the record as a whole" that the proposal will establish "just and reasonable" rates for the area. In short, there is no virtue in the end result having come from judicial-like conception, gestation and the supposed agonies of deliverance. What the nation needs is gas, that is, gas that is burnable.

12. Following our initial classification, see *SoLa I:* 434 n. 86, FPC east UDC as consumer advocates.

As it did in Op: 598, FPC also adopted the terms of a proposed settlement as its decision on the merits of the Hugoton-Anadarko Area Rate Case, Op: 586, aff'd, 9 Cir., 1972, 466 F.2d 974. The Ninth Circuit, taking specific notice of the fact that the proposal was adopted on its intrinsic merits rather than as a traditional settlement *per se,* heartily endorsed the procedure. We called for supplemental briefs to determine the relevance of that case to this. Both FPC and UDC suggest that *Hugoton-Anadarko* is controlling. Indeed, they suggest that FPC's adoption of the proposal for SLA is even more appropriate than *Hugoton-Anadarko* because (i) the parties in *SoLa II* were given an opportunity to rebut the proposal with additional evidence, (ii) the *SoLa II* proposal, unlike that for *Hugoton-Anadarko* clearly specified the rate of return under which the rates were established, and (iii) the *SoLa II* proposal enjoys substantial support from consumers as well as producers interests. Mobil, on the other hand, informs us that it, along with *all* of the other producers in *Hugoton-Anadarko* supported *that* proposal. We find this to be a distinction without merit. In both cases the proposals were adopted—not as settlements—but rather as resolutions on the merits. Hence, we believe that the presence of support by both consumers and producers yields a greater likelihood of acceptability by FPC than does the unanimous support of all producers.

NYPSC raises a more serious objection to FPC's adoption of the settlement proposal. It objects to the apparent "all or nothing" approach which FPC took toward the proposal. As a topical preface this brings us to the fundamental question—whether, viewing the terms of the proposal not as a traditional settlement but as a result of an administrative decision, it falls within that "zone of reasonableness" which is supported by "substantial evidence on the record as a whole". It is upon this question that we must focus our attention in the context of this case. Consequently, we consider the evidence and evaluate the FPC sanctioned settlement proposal in that context.

### IV. No Gas. What Do We Do?

"The heart of this problem is the elusive, exhaustible, and irreplaceable nature of natural gas itself. Given sufficient money, we can produce any disired amount of railroad, bus, or steamship transportation. * * * But the wealth of Midas and the wit of man cannot produce or reproduce a natural gas field."

FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 629, 64 S.Ct. 281, 300, 88 L.Ed. 333, 359 (Jackson, J. dissenting.)

▪ We may not as judges ignore what all others see. And certainly we cannot ignore what the agency charged by Congress with protecting, not the price of gas at the Brooklyn burner tip, but the *supply* of gas to meet that and other needs, has found. Led by FPC, all others in the nation sense with a desperate urgency an energy supply shortage which can only be described as a crisis.[13]

13. As might be expected, there is some controversy over this. Standing virtually alone against the National (and record) judgment of a near energy calamity, the American Public Gas Association (APGA) contends that the current critical shortage of natural gas is but a pretextual "cry of wolf" calculated to mislead FPC into establishing artificially high rates in the producers' behalf. APGA would have us believe that the energy crisis is a mirage—indeed, a hoax! APGA claims that "there appear to be adequate supplies of gas in the domestic United States to satisfy the projected demands of U. S. consumers well into the 21st Century."

APGA Supp. Brf. at 5 n. 9. But to talk of "Supplies" of gas is a misleading oversimplification. Obviously, the gas is not presently available. At most, if there is appropriate exploration, the demonstrable reserves may be exploited to meet the needs. Given a system which depends on private stewardship and marshalling of natural resources, there is a supply shortage if the producers do not produce. FPC has the statutory duty, not only to guard the consumers against super-profits reaped from artificially inflated rates, but also to protect consumer interests by making sure that the rate schedule is high enough to elicit an adequate supply. It is

Spurred by the efficiency of gas as an energy source, the attractiveness of natural gas rates as compared with those for other energy sources, and most recently by a belated but vigorous national clamor for an ecologically beneficial energy source, American consumption of natural gas for industrial, commercial, and private consumer use is rapidly expanding. This proliferating demand has already outstripped a dwindling supply.[14] Thus, there is an increasing gap be-

a delicate balancing test. FPC must fix its course to attain the utopian "optimum" rate schedule. Given the current shortage of available supply FPC must swing the pendulum towards the incentive, supply-eliciting side of rates. And so it has done.

14. Staff Report No. 2, which chronicles the supply and demand patterns of the past and projects the picture for the period 1971–1990 reveals that in 1971, for the first time ever, available supply failed to meet actual demand. In that year there was .9 Tcf of unsatisfied demand. As the following table and chart reveals, Staff projects more drastic shortages in the future:

Table 1
UNITED STATES GAS SUPPLY-DEMAND BALANCE
Actual 1966-1970; Projected 1971-1990
(All Volumes in Trillions of Cubic Feet @ 14.73 Psia and 60° Fahrenheit)

| Year | Annual Demand 1/ | Net Pipeline Imports | LNG Imports | Gas From Coal | Gas From Alaska | Gas From Liquid Hydrocarbons | Domestic Production | Annual Consumption | Un-Satisfied Demand | Reserve Additions | Year-end Reserves | R/P Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1966 | 17.9 | 0.4 | * | | | | 17.5 | 17.9 | 0.0 | 19.2 | 286.4 | 16.4 |
| 1967 | 18.8 | 0.5 | * | | | | 18.4 | 18.8 | 0.0 | 21.1 | 289.3 | 15.8 |
| 1968 | 19.9 | 0.6 | * | | | | 19.3 | 19.9 | 0.0 | 12.0 | 282.1 | 14.6 |
| 1969 | 21.3 | 0.7 | * | | | | 20.6 | 21.3 | 0.0 | 8.3 | 269.9 | 13.1 |
| 1970 | 22.6 | 0.8 | * | | | | 21.8 | 22.6 | 0.0 | 11.1 | 259.6 | 11.9 |
| 1971 | 24.6 | 0.9 | * | | | ** | 22.8 | 23.7 | 0.9 | 12.0 | 248.8 | 10.9 |
| 1972 | 26.1 | 1.0 | * | | | ** | 23.8 | 24.8 | 1.3 | 13.0 | 238.0 | 10.0 |
| 1973 | 27.7 | 1.1 | * | | | ** | 24.7 | 25.8 | 1.9 | 14.0 | 227.3 | 9.2 |
| 1974 | 28.8 | 1.1 | * | | | ** | 24.8 | 25.9 | 2.9 | 15.0 | 217.4 | 8.8 |
| 1975 | 29.8 | 1.2 | 0.3 | | | ** | 24.7 | 26.2 | 3.6 | 16.0 | 208.7 | 8.4 |
| 1980 | 34.5 | 1.6 | 2.0 | 0.3 | 0.7 | ** | 20.4 | 25.0 | 9.5 | 17.0 | 186.1 | 9.1 |
| 1985 | 39.8 | 1.9 | 3.0 | 1.4 | 1.3 | ** | 18.5 | 26.1 | 13.7 | 17.0 | 175.4 | 9.5 |
| 1990 | 46.4 | 1.9 | 4.0 | 3.3 | 2.3 | ** | 17.8 | 29.3 | 17.1 | 17.0 | 170.4 | 9.6 |
| 1971-1990 Totals | 707.6 | 31.1 | 38.0 | 17.3 | 20.6 | ** | 414.2 | 521.2 | 186.4 | 325.0 | • | • |

\* Very small volume.
\*\* Insufficient data for quantitative projection; unsatisfied demand will be reduced by the amount of SNG actually produced.
1/ Contiguous 48 states.

tween supply and demand, and the consumers are feeling, or shortly will feel, the pinch. See e. g. International Paper Co. v. FPC, 5 Cir., 1973, 476 F.2d 121; FPC v. Louisiana Power & Light Co., 1972, 406 U.S. 621, 92 S.Ct. 1827, 32 L. Ed.2d 369; The Hugoton-Anadarko Area Rate Case, 9 Cir., 1972, 466 F.2d 974; City of Chicago v. FPC, 1971, 147 U.S.App.D.C. 312, 458 F.2d 731, 747–749. Finger-pointing accomplishes nothing, for there is no single isolated factor which has contributed to this shortage. History may well record this near crisis as just another of man's made problems which, like the serpent and the apple, he was not able to discern, though batteries of lawyers now demonstrate that the whole establishment has been on a collision course to a BTU catastrophe. The crucial fact is that it exists.

On reconsideration after *SoLa I*, FPC took our suggestion to heart and carefully scrutinized the supply situation. What it saw is most alarming. And it was this single over-riding fact that precipitated FPC's corrective action in *SoLa II*. It said:

61. The evidentiary fact which most concerns us is not in dispute: the traditional trend lines for measuring adequacy of supply, namely, reserves to production (R/P) and findings to production (F/P) ratios, are in a declining mode. In Opinion No. 546 it was stated that the ratio of new supply to net production of natural gas, both in the United States and for the Southern Louisiana area, was not significant in helping to determine reasonable rates. The statement was erroneous and non-supported, and we now correct it.

Comparatively speaking, SLA may be in a better supply position than

Figure 1

UNITED STATES GAS SUPPLY-DEMAND BALANCE
(Contiguous 48 States)

*U.S. Natural Gas Reserve Additions (1971-1990) Total 325 Trillion Cubic Feet.

Of course we can take judicial notice of the fact that gas companies all over the country are having to curtail the service to their customers.

other gas producing areas.[15] But it would be inappropriate for FPC to set rates for SLA based solely on internal data. For we are a country of *United States*, and SLA accounts for approximately 33.4% of the natural gas production in the continental 48 states.

There is ample evidence from which FPC could make this conclusion. The F/P ratio for SLA has been less than unity for the past five years. In simple terms, this means that the industry is producing more natural gas from its wells than it is finding new reserves. This singular fact also proves, *a priori*, that the R/P ratio is in a "Declining mode". Staff has suggested that a R/P ratio of 14 represents a national danger point. As the following table indicates, we are red-lined:

Figure 2
NATIONAL GAS SUPPLY TRENDS
R/P AND F/P RATIO
1946-1970

And in many ways the situation in SLA is even more immediate, for its resources have had to bear the brunt of the increased national demand. In 1956, SLA's share of national natural gas production was only 12.8%. By 1970 it had soared to 33.4%. The large amounts of production necessary to accommodate this demand necessarily increased the denominator of the fraction and caused the R/P ratio for SLA to decrease from 21.0 in 1964 to its present level of 10.8. Staff Report No. 2, at 20.

National drilling data indicates a tendency over the past few years to drill fewer, but deeper, wells. SLA has certainly conformed to the latter, but exploratory efforts there have remained relatively stable. Producers drilled 2150 wells in SLA in 1956, the national peak year, and 2185 in 1970. Staff attributes this fact to the offshore leases. Unquestionably the offshore reserve possibilities are the major hope for a future supply. Currently, 50% of SLA's production and about 25% of national production comes from this federal domain. But if SLA is to continue to supply its share of the national gas production, it must have incentives to encourage development of these resources.

Justice Jackson was certainly correct in suggesting that the inherently unique nature of gas is at the heart of the energy problem. But as this history of production in SLA itself demonstrates, "the wealth of Midas and the wit of man"— although they may be incapable of increasing nature's gifts—can encourage private entrepreneurs to develop the resources which God has bestowed upon the earth.

Fully aware of the critical gas supply shortage, and fully familiar with the factors which motivate producers to develop the resources to meet the demand, FPC approached its statutory task of establishing the "just and reasonable" rates for the sale of natural gas at the well-head in SLA.

## V. A Triumvirate of Incentives

As we noted above, Op: 598 established a three-point rate structure with the hope that it would "be sufficient to assure confidence in the financial integ-

---

15. SLA is the most prolific source of natural gas and her offshore potential is staggering. The quality of SLA gas is uniformly high, too. Staff has broken down its discussion of supply in terms of the seven geographically identifiable producing areas mentioned in note 3, *supra*. Staff Report No. 2, Ch. 2.

rity of the enterprise, so as to maintain its credit and attract capital." FPC v. Hope Natural Gas Co., 1944, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345. First it established rates for both flowing and new gas which FPC believed would encourage exploration and development of the rich natural gas resources of SLA. Second, it ordered a $150,000,000 refund in accordance with the terms of the settlement proposal, but —in order to protect the capital position of the producers—allowed the producers owing these refunds to work them off by the commitment of additional reserves to the jurisdictional market. And third, it provided for periodic and contingent escalations of these ceilings.

We hold that this structure was amply supported by "substantial evidence on the record as a whole".

### Flowing Gas

The genesis of many of the objections raised to the Op: 598 rate scheme is the specification of flowing gas rates. In SoLa I, FPC established two vintages of pre-October 1, 1968 gas, (i) gas committed under pre-1961 contracts could be sold at a maximum of 18.5¢/Mcf (onshore) or 17.0¢/Mcf (offshore), and (ii) gas committed under contracts signed between January, 1961 and October 1, 1968 could bring 19.5¢/Mcf (onshore) or 18.0¢/Mcf (offshore). Although we pointed out that our mandate was an affirmance of these rates, we poignantly emphasized that our opinion did not foreclose the possibility of change. On

rehearing we reiterated: "We wish to make crystal clear the authority of the Commission in this case to reopen any part of its order that circumstances require be reopened." SoLa I: 444 F.2d at 126. Not only did this invest FPC with the authority to redetermine SoLa I rates but it also enabled it to effectuate these rates by modifying the refund order of SoLa I.

In SoLa II, (Op: 598) FPC acknowledged its prior failure to take full account of the supply situation and redetermined the rate for flowing gas at 22.-375¢/Mcf [16] which included an additional component for exploration and development. It abolished its prior distinction between first and second vintage gas and adopted a single rate for pre-October 1, 1968, flowing gas on the basis of Staff's breakdown on costs.[17] The costing methodology employed by Staff, with one minor exception,[18] was the same for SoLa II as for SoLa I. Thus, "by recommending a flowing gas price higher than that arrived in Op: 546, * * * Staff was candidly and correctly making the flowing gas cost bear a part of the responsibility for further exploration—in other words it was looking to the total rate design." Op: 598, ¶ 155.

So, the legal issue precipitated by this change of Op: 598 over Op: 546 is whether flowing gas must bear a portion of the burden for the exploration and production of new gas in the future. Finding that the additional gas flow generated by this added increment of

16. The rate is one cent less for offshore gas.

17.
| | | |
|---|---|---|
| 1. | Cash Expense | 1.81 |
| 2. | DD&A | 4.00 |
| 3. | Return at 13 percent | 5.46 |
| 4. | Total Production Cost | 11.27 |
| 5. | E&D Expense | 5.47 |
| 6. | E&D Return at 13 percent | 1.10 |
| 7. | Total E&D | 6.57 |
| 8. | Total at 14.73 psia | 17.84 |
| 9. | Total at 15.025 psia | 18.20 |
| 10. | Gathering Cost | 0.51 |
| 11. | Regulatory Expense | 0.17 |
| 12. | Production Tax | 2.30 |
| 13. | Total | 21.18¢ per Mcf |

Op: 598, ¶154

18. FPC did abandon the old BTU method of allocating drilling expenses for casinghead gas between the oil and the gas in favor of making a "direct assignment" based on survey data. This change may have accounted for 1¢Mcf difference, but it was noted that the difference "is more than accounted for by the range of estimates presented to us in the other choices implicit in the flowing gas costing methodology". Op: 598, ¶153.

the flowing gas rate would aid producers to more fully exploit the natural resources of SLA, FPC held that they should. MDG, the principal opponent of this change, suggests that this is totally unacceptable. MDG argues that, (i) most of the capital used for the exploration and development of natural gas resources is derived from oil anyway, and that (ii) Op: 598 carries no assurance that any such internally generated funds will be used for exploration in SLA.

Public utilities, if indeed we may call the Natural Gas Industry a public utility, depend on various sources for their capital. See generally, 1 Priest, Principles of Public Utility Regulation, Chapter 13 (1969). Both equity and debt capital are used. But internally generated retained earnings are also used. Indeed, Professor Priest points out analogously, that 50% of the funds used for utility expansion in the electrical utility industry in the period from 1956 to 1965 were generated internally. Thus, we cannot ignore FPC's determination that the extra earnings to be acquired through income for flowing gas at the increased rate would generate additional, and needed, internal capital available for expenditure in the search for new gas reserves.

As to the contention of some consumers that the rates established by Op: 598 for flowing gas are not supported by the cost data in the record, we echo Commissioner O'Conner's prophesy, "The time is right to abandon costs as the sole referential." [19] *Permian I*, 34 F.P.C. 244, 248–249. In affirming FPC's rate structure in *Permian*, the Supreme Court expressly recognized the possibility that price could be used functionally to encourage greater exploration and development. Likewise, in *SoLa I*, we specifically held that non-cost items which were properly labeled and justified could be interjected into the rate structure. Thus we hold that FPC properly determined that it was in the public interest to have the flowing gas rate bear part of the cost of future development.

This holding involves no great logical or economic leap. For the anomalous categorization of rates by date of contract rather than date of production yields a somewhat artificial distinction. Natural gas is a fungible commodity as it comes from the bowels of the earth, neither severed nor identified to a particular contract. One molecule of gas flowing from a particular producer's well in SLA might be ultimately piped

---

19. Obviously FPC is currently minimizing or at least deemphasizing the use of unit costing as a basis for area rate regulation. Recognizing the wide fluctuations in cost mathematics and the problems of assessment, appraisal and allocation which are so inextricably interwoven with the method, it said in Op: 595, only two months before it issued Op: 598:

"We have re-examined many of the assumptions and conclusions implicit in the judgments expressed in *Permian, supra,* and *Southern Louisiana* and this reexamination has generally revealed a much broader zone of reasonableness within which the judgmental process must operate than is apparent from even a careful examination of these two decisions. Also, the seeming precision of the mathematical calculations has given the appearance of certitude which in fact does not exist." Texas Gulf Coast Area Rate Case, Op: 595, 45 F.P.C. 674, 686.

Thus, from the administrative standpoint at least, the unit costing method of rate calculation is, at most, merely a point of departure, whatever that navigational figure means in the quest for something even more enshrouded in fog. Final administrative determination of "just and reasonable" rates may get closer and closer to a basis of existing market conditions.

In *SoLa I* we held that it is proper for FPC to use non-cost elements to encourage exploration and development of natural gas resources. In Op: 598 FPC has done just that, though it masks its calculations as inaccurate cost computations. Because we find FPC's adoption of the terms of the settlement proposed to be supported by "substantial evidence on the record as a whole" we pretermit any further inquiry into the extent to which FPC may abandon or employ the concept of unit costing.

to a large industrial factory pursuant to a 1962 contract, which under the terms of Op: 598 would permit a maximum well-head price of 22.375¢/Mcf. At the same time its identical contiguous twin might cook the dinner for the famed "little lady at the burner-tip" and, yet, yield a well-head price of 26¢/Mcf merely because it happened to be covered by a 1969 contract. It is therefore anomalous, if not downright inaccurate, to speak of "old" gas. There is no "old" gas. As it presses to freedom at the well-head, it is as "new" as any other of nature's offspring. It may be "old" in the sense that some arrangement confected long prior to its release made production possible. But if—and this can be no if—rates for so-called "new" gas must carry an increment to enable the continued re-supply of this depleting commodity, this "old" gas, indistinguishable molecularly, must carry this burden like an added atom in its carbon ring. Cf. Ziegler v. Phillips Petroleum Co., 5 Cir., 1973, 483 F.2d 858.

There is no error. The rate is sustained.

20. APGA does contend that, by relying too heavily on industry-supplied AGA data, FPC has failed to follow the mandate of this Court in *SoLa I* to premise its future rate-making on supply and demand. As we demonstrate in note 13 *supra*, APGA's notion that there is no supply shortage is blindly unrealistic.

21. FPC obviously realized that supply is not the only market variable that is a function of price. In the short-term market for natural gas, both supply and demand are relatively inelastic, i. e., neither will shift drastically in the short-run with an increase or decrease in price. Mobil has pointed out in this appeal that perhaps the burgeoning demand for natural gas, which it attributes at least in part to artificially deflated rates in the past, has made a significant contribution to the energy crisis. The theory behind the incentives implemented by Op: 598 is that supply is at least sufficiently elastic in the short-term to prevent an immediate castastrophe. Calloused, or perhaps feeling so, from hundreds of David's little

*New Gas*

FPC established a maximum permissible rate for "new" gas, i. e. gas delivered under post-October 1, 1968 contracts, at 26¢/Mcf. Of all the various parties [20] and interests represented in this case, only Mobil and Amoco suggest that this rate is too low. Mobil contends that the rate only allows for "bare-bone" cost recoupment, and therefore, does not fulfil the duty to ensure the financial integrity of the natural gas industry and attract or generate capital for future exploration and development of natural gas reserves. We are convinced that this rate clearly falls within the "zone of reasonableness" latitude which Courts must grant to FPC action.

FPC began its cost calculations for new gas by categorically rejecting "any 'what-the-traffic-will-bear' approach" and adhering "to the judicially required test of a price equal to but no higher than the level required to bring forth the necessary supply." Op: 598, ¶ 101. And in making its initial determination of targeted supply, it started "from the premise that we are not bound to provide a price to satisfy all gas demands." Op: 598, ¶ 74.[21]

slings as its orders were reversed or modified by a nation-wide system of courts whose power to act stemmed from the sheer accident of residence of some party, animate or corporate, and a stop watch race to the courthouse, FPC cautioned against holding it to specific productivity:

It is not our duty to fix a rate to meet any and all possible demands for natural gas. When all demands for natural gas were being met, by and large, that is, from the beginning of the post-World War II expansion of the pipelines until the latter part of the 1960's, it was possible to indulge in the luxury of theorizing about maximums and minimums in level of service. As we see the situation today, there is ample justification of our fixing as one immediate goal a containment of the panic psychology which fears of shortage always engender. Actual shortages are most significant as they portend for the whole country problems in gas supply, and that psychological pressure is being keenly felt right now. Therefore, we will not make our future task more difficult by setting

The idea that price should be used functionally to elicit supply is not novel. In *SoLa I* we echoed Justice Jackson's 1945 wisdom in Colorado Interstate Gas Co. v. FPC, 1945, 324 U.S. 581, 612, 65 S.Ct. 829, 843, 89 L.Ed. 1206, 1228:

Far-sighted gas-rate regulation will concern itself with the present and future, rather than with the past, as the rate-base formula does. It will take account of conditions and trends at the source of the supply being regulated. It will use price as a tool to bring goods to market—to obtain for the public service the needed amount of gas. Once a price is reached that will do that, there is no legal or economic reason to go higher; and any rate above one that will perform this function is unwarranted. * * * On the other hand, if the supply is not too plentiful and the price is not sufficient incentive to exploit it and fails to bring forth the quantity needed, the price is unwisely low, even if it

does square perfectly with somebody's idea of return on a "rate base."

But quantifying this functional relationship, especially in a market of such imponderables, is another matter, for "the relationship between price and supply brought to the market over time depends upon numerous factors including monetary inflation, changes in real cost of input resources, availability of input resources, changes in alternative investment opportunities development of new producing areas, size of prospective reservoirs, changes in business confidence, degree of directionality of exploratory efforts, changes in industry technology, and other factors influencing business decisions." Op: 598, ¶ 77. With this many variables, it is impossible, with any degree of precision likely to satisfy the momentary opponent's fetish for quantification, to determine the likely quantitative effect on supply of a change in rate ceiling. Though it detailed a breakdown of costs [22] for new

supply goals which, if they are later not met, will lend a false credence to the negativism about our resources capability which is already spreading widely.

The rate level and rate design features of the settlement proposal give us a starting point for proceeding in an orderly fashion.
Op: 598, ¶ 70.

[22]. The breakdown of new gas costs given by Staff Witness Engel and accepted by FPC as a reference point for its Matrix of cost components was as follows:

| | | Current | Future |
|---|---|---|---|
| 1. | Successful Well Costs | 3.91 | 4.29 |
| 2. | Lease Acquisition Costs | 1.37 | 1.37 |
| 3. | Other Production Facilities | 0.88 | 0.88 |
| 4. | Subtotal | 6.16 | 6.54 |
| 5. | Dry Hole Costs | 2.12 | 2.67 |
| 6. | Other Exploration Costs | 1.81 | 1.81 |
| 7. | Subtotal | 3.93 | 4.48 |
| 8. | Production Operating Expense | 3.10 | 3.10 |
| 9. | Return on Investment | 8.41 | 8.93 |
| 10. | Return on Working Capital | 0.44 | 0.45 |
| 11. | Net Liquid Credit | (3.89) | (3.89) |
| 12. | Regulatory Expense | 0.17 | 0.17 |
| 13. | Subtotal | 18.32 | 19.78 |
| 14. | Royalty at 15% | 3.23 | 3.49 |
| 15. | Subtotal at 14.65 psia | 21.55 | 23.27 |
| 16. | Subtotal at 15.025 psia | 22.10 | 23.87 |
| 17. | Area Gathering | 0.51 | 0.51 |
| 18. | Production Tax | 2.30 | 2.30 |
| 19. | Total | 24.91 | 26.68 |

Op: 578, ¶127.
See note 405–1 *supra*.

gas, FPC concluded that because of the uncertainty of this element and others, a 4–5¢ zone of reasonable deviation existed.[23] Accordingly, it adopted without reservation that 26¢/Mcf price of new gas established by the proposed settlement agreement. As to defining the rate to supply relationship, FPC said in effect that "we know that it's positive, but we can't say just how positive". FPC has to be no more prescient. Nor could we. It seriously believed that the total rate structure of Op: 598 would call forth a sufficient supply to meet projected needs.

The target goal for the 1971–1975 period was approximately 45–50 trillion cubic feet, keeping relatively constant SLA's approximate 33.4% contribution to total national demand. The added incentive of a contingent escalation on flowing gas rates could reasonably be thought to encourage the commitment of 15 Tcf within the 5 year period. Likewise, the refund credit structure would stimulate another 15 Tcf of new reserves. The remaining 15 Tcf needed to make up the quota would depend primarily on the basis of the inherent incentive of the rate schedule. But FPC did not stop there. Since no one disputes that the greatest prospects for development of SLA's natural gas resources are the offshore leases,[24] FPC gave an added incentive for offshore drilling. Gas produced from the offshore leases is not subject to the 2.-3¢/Mcf Louisiana severance tax.[25] By allowing offshore gas to be sold at the same maximum rate as onshore gas, which included the tax, FPC not only took into account possible greater costs of production, but simultaneously gave a strong stimulant for development of these resources.

The 26¢/Mcf rate for gas delivered under a post-October 1, 1968 contract which FPC adopted in Op: 598 clearly falls within the range of cost estimates which the evidence discloses. Accordingly, FPC properly declined to make what would be a necessarily speculative quantification of non-cost elements. The rates for so-called "new" gas are sustained.

*Those Elusive Refunds*

■ Because the flowing gas rates which many of the producers in SLA have been collecting subject to refund in the past exceeded the rates determined to be "just and reasonable" by FPC in Op: 598, FPC ordered substantial refunds to remedy the over-charge. From

23. In its recent bevy of area rate cases, FPC has realized that its calculations are necessarily inexact. In the Texas Gulf Coast Area Rate Case, Op: 595, 1971, 45 F.P.C. 674, 687 it said:

"The cost computations used in this and other area rate proceedings seem to be mathematically precise. They are not. Allocations of costs are by nature matters requiring a substantial amount of judgment."

Realizing the limitations on its ability to reflect actual costs of individual producers in an industry-wide area rate, and the fluctuations which were bound to result from making the effort, FPC abandoned all efforts at quantifying non-cost factors in favor of establishing a permissible zone of deviation for costs. In *Texas Gulf Coast*, as here, it found that new gas costs could fall at any point within an approximate 4¢/Mcf range. Id. at 705.

24. This demonstrates the difficulty of pinpointing all of the causes of the natural gas supply shortage. Until very recently, the federal government, which controls the vast acreage of almost assured reserves, has had a moratorium on leasing—largely because of ecological factors. Without leases, the producers may not drill—no matter how attractive the rate structure. See generally Staff Report No. 2.

25. After August 1, 1972, Louisiana severance tax will be calculated on the basis of 2.3¢/Mcf or 11.5% of the value of the gas at the time and place of severance, whichever is greater. Assuming—and we make no suggestion that this is the proper manner of calculation—the well-head rate for gas is used for calculating the tax, the tax on a 26¢ Mcf would be 2.99¢. Recognizing this potential obligation of the producers, FPC issued Order 456 on August 4, 1972. Order 456 allows increased rate filing under Section 4(b) to go into effect without the 30 day notice period.

a supply-oriented perspective, however, FPC also realized that refunding was a significant disincentive for current and future exploration and development and a possible impairment of the current capital situation of many companies. Accordingly, Op: 598 adopted a procedure to allow those producers owing refunds to cancel their refund obligations by committing new gas reserves to jurisdictional sales in SLA. To do this, a refund credit of 1¢/Mcf for new gas committed to the interstate market was allowed by FPC.[26] The entire refund program is vigorously attacked on appeal.

Basically, the attacks fall into one of two categories: (i) that FPC exceeded its authority and the mandate of *SoLa I* by reducing the total amount of refund from $375,000,000 in *SoLa I* to $150,000,000 in *SoLa II*, and (ii) that the refund credit program arbitrarily and capriciously discriminates against producers, like Mobil and Amoco, who have entered into voluntary company-wide settlement agreements by which they have already made substantial refunds and reduced the rates for flowing gas in favor of relative intransigents like Humble,[27] Shell, Superior Oil, and the California Company who have continued to charge rates subject to refund now found to be excessive.

### The Amount of the Refund

The gist of the first argument is that FPC has no power to alter or modify refund obligations which were established in Op: 546 and affirmed by this Court in *SoLa I*. Because the rates for flowing gas under the *SoLa I* rate scheme were significantly lower than the rates established by Op: 598, the refunds which were calculated under that basis were approximately $375,000,000. Under the terms of the settlement proposal, accepted by FPC in Op: 598, a stipulated refund obligation of $150,000,000 is to be imposed upon the various producers in accordance with the following schedule:

(a) Prior to January 1, 1965, amounts collected above the just and reasonable rates of 20.625 cents per Mcf (onshore) and 19.625 cents per Mcf (offshore).

(b) From January 1, 1965, to September 30, 1968, amounts collected above the just and reasonable rates of 21.25 cents per Mcf (onshore) and 20.25 cents per Mcf (offshore).

(c) From October 1, 1968, to January 1, 1971, refunds shall be calculated by applying 30.5 percent of the difference between revenues for this period based on rates in effect prior to October 1, 1970, and the revenue which would have resulted for this period through application of rates established in Opinion Nos. 546 and 546–A, as modified by Opinion No. 567.

(d) After January 1, 1971, refunds shall be made for amounts collected in excess of the ceiling prices established herein.

Op: 598, ¶ 170.

The most fundamental argument raised by the opponents of the proposal is that the prior refund obligation

---

26. If a producer elects to discharge his refund obligations in this manner he must offer 50% of the new reserves to the same customer to whom the cash refund is owed. Only if that offer is rejected in writing may he discharge any of his obligation with respect to that customer by commitments to another customer. This 50% rule is attacked by NYPSC as being unfavorable to the consumer to whom the obligation is due, and, on the other hand by Placid as putting too many restrictions on the producer owing the refunds. We find that the manner in which FPC ordered the discharge of the refunds is amply supported by the credible evidence. It fairly balances the interests of the producers with those of the consumers.

In the event that there are remaining refund obligations on October 1, 1977, they are to be paid in cash with interest from August 1, 1971.

27. In tune with its world-wide jingle to "change our name but not our stripes", Humble is now Exxon.

of $375,000,000 was affirmed by this Court in *SoLa I*. But in making this argument the parties ignore, or gloss over, our opinion on rehearing. For there we categorically rejected the notion that the label "affirmance" could possibly impair FPC's ability to alter or modify *any* of the provisions, particularly the refund provisions, of its *SoLa I* rate scheme if it believed that the exigencies of the gas industry required more effective remedial measures. Thus, we held:

> "Under Section 19(b) of the Natural Gas Act, this Court has the broad remedial powers that inhere in a court of equity and pursuant to our equitable powers we make it part of the remedy in this case that the authority of the Commission to reopen any part of its orders, including those affecting revenues from gas already delivered, is left intact. The Commission can make retrospective as well as prospective adjustments in this case if it finds it in the public interest to do so. * * * It may be that the Commission will decide that the refunds it has ordered are just and reasonable or at least that their significance to the public interest is outweighed by the confusion and delay that would result from their reopening. In this event, the Commission will allow its refund orders to stand as they are. Or it may be that the refunds are too burdensome in light of new evidence to be

in the public interest. In that case it is our judgment that the Commission shall have the power and duty to remedy the situation by changing its orders."

*SoLa I:* 444 F.2d at 126–127 (on rehearing).

This is the law of the case, and so it stands.[28]

The chosen refund amount is also challenged on several other bases. NYPSC contends that there is no evidentiary basis for the $150,000,000 figure. It also suggests that any incentive function to be served a refund work-off program would be an impermissible superfluity since the "just and reasonable" rates established by FPC are by definition those rates which will maintain confidence in the industry and attract capital. Finally, it is contended that the reduction in the amount of refund from the *SoLa I* order gives a competitive advantage to the proponents of the settlement agreement.

 The short answer to the contention of some of the consumers that the refund scheme is not supported by the evidence is that the stipulated refund amounts are more beneficial to their particular interests than would be a refund order based on the "just and reasonable" rate established for flowing gas by Op: 598. The flowing gas rate sanctioned by Op: 598 is 22.375¢/Mcf (onshore) or 21.375¢/Mcf (offshore).

---

28. The Supreme Court has also recognized that an administrative agency has the flexibility to modify an order which has not been unequivocally affirmed by a court of law. In United Gas Improvement Co. v. Callery Properties, 1965, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 289, Justice Douglas wrote:

> We also conclude that the Commission's refund order was allowable. We reject, as did the Court of Appeals below, the suggestion that the Commission lacked authority to order any refund. While the Commission "has no power to make reparation orders," Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L. Ed. 333, 353, its power to fix rates under § 5 being prospective only, Atlantic Re-

fining Co. v. Public Service Comm'n, supra, 360 U.S. at 389, 79 S.Ct. at 1254, 3 L.Ed.2d at 1319, it is not so restricted where its order, which never became final, has been overturned by a reviewing court. Here the original certificate orders were subject to judicial review; and judicial review at times results in the return of benefits received under the upset administrative order. See Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 200–201, 67 S.Ct. 1575, 1579–1580, 91 L.Ed. 1995, 2001. An agency, like a court, can undo what is wrongfully done by virtue of its order. Under these circumstances, the Commission could properly conclude that the public interest required the producers to make refunds.

The stipulated refunds for first vintage gas, however, provided for a refund of amounts in excess of 20.625¢/Mcf (onshore) or 19.625¢/Mcf (offshore) for the pre-1965 period and 21.25¢/Mcf (onshore) or 20.25¢/Mcf (offshore) for the period from January 1, 1965 to September 30, 1968. If the refunds had been calculated on the basis of the rates established for flowing gas and approved by us in this Opinion, they would have been substantially *less* than the $150,000,000 about which some consumers complain. Thus, we hold that the evidence amply supported the reduction in amount of total refund ordered in *SoLa II*. FPC does not *have* to order refunds under the terms of the Natural Gas Act.[29] It *may* do so. And to the extent that it does order refunds, it is empowered to adopt a schedule or structure of refunds which it, in its administrative discretion and expertise, believes will fairly balance the interests of both consumers and producers while achieving the overriding public interest, that interest in the 1970's being the quest for an increased supply to meet an insatiable demand.

Neither will we hold that FPC is limited to the discredited contention that the rate of return must be self-sufficient as an incentive. Not the least of the problems under the anomalous structure of utility type regulation of an activity which combines both a service and a sale of a depleting asset with no statutory compulsion as to future activity save continuance of specific sales is the lack of any assurance that revenues generated by even the most generous of incentive rates will be invested in new production or reserves of interstate gas. Among large integrated producers there is always competition between oil or gas in the use of these dollars. And among all, the choice is even more severe as between *intra* and *inter* state gas sales.

FPC is entitled to formulate its incentive programs in the mode best suited to accomplish the various goals of the regulatory undertaking. Amoco suggests that FPC could have obviated the need for the refund credit and contingent escalation incentives adopted by Op: 598 by establishing the "just and reasonable" rate of flowing gas at 26¢/Mcf, and the rate for new gas at 30¢/Mcf or higher. Given the financial posture of the various producers, and taking full account of the consumer interests, FPC had the right to conclude that it was more in the interest of consumers for the producers to keep those funds which were paid in the past than to pay an even greater rate in the future. And given that possibility, we cannot say that FPC erred in adopting the refund provisions as it did.

As to the argument that the reduction in refund obligations from *SoLa I* to *SoLa II* benefited some producers more than others, even FPC recognized that the cosmic plan which it adopted has some atomic flaws. It confessed: "Candor requires us to admit that some of the predicted inequities as among producers will surely occur, and those who have attempted to work within 'the system' are comparatively disadvantaged." Nevertheless, FPC concluded that the overall structure would stimulate greater exploration and development and have a general pro-competitive effect. We will not reject an administrative decision merely because one producer's piece of cake is iced and another's is not. The crucial factor, in total alignment with both *Permian* and *SoLa I*, is that both get *some* cake. Given the wisdom of the administrative desire to elicit new supply, and accepting the proposition that the incalculable relationship between rate and supply is positive, we refuse to tamper with an overall program which effectively exploits that

---

29. § 4(e) of NGA, 15 U.S.C.A. § 717c(e); Mesa Petroleum Co. v. FPC, 5 Cir., 1971, 441 F.2d 182; Continental Oil Co. v. FPC, 5 Cir., 1967, 378 F.2d 510; Public Service Commission of New York v. FPC, 1964, 117 U.S.App.D.C. 287, 329 F.2d 242, cert. denied sub nom., Prado Oil Co. v. FPC, 1964, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735.

relationship. FPC's order setting the total refund obligation of all gas producers in SLA is therefore fully sustained.

### The Refund Credit

■■ Op: 598 provided for a refund credit of 1¢/Mcf committed to the interstate market in SLA. This refund work-off is vigorously challenged by major producers Mobil and Amoco and consumer advocates NYPSC and MDG. The producers' main argument is based on the fact that under the structure of NGA and unlike that of most regulated utilities, the obligations arise from a private contract—here between (i) producer and (ii) pipeline purchaser.[30] Consequently, the argument goes, it is unrealistic to set up a refund structure which is industry-wide in terms of benefits but necessarily individualized as to in-put. As Amoco puts it: "refund amounts are individual liabilities, not industry burdens." (Amoco Initial Brief at 40.) Amoco contends that the refund credit coupled with the contingent escalation for flowing gas places burdens unevenly within the industry. The argument runs this way. Those producers who have adamantly adhered to excessive prices under their old gas contracts will use all, or the majority, of their new commitment to interstate sales to work-off their heavy refund obligations—thus, netting 1¢/Mcf more for their new gas than Amoco and Mobil.

In addition to this 1¢/Mcf disparity in the net yield of new gas, Amoco, Mobil, and others who have worked within the system and made voluntary company-wide settlement agreements and substantial refunds will have to credit their new additions to the interstate market towards the target goals which trigger the contingent escalations. Thus, the argument goes on, once Amoco and Mobil have committed enough new reserves to trigger the contingent escalation, then Humble and Shell and their fellow "delinquents"[31] will be able to reap the benefits by collecting the additional rev-

---

30. United Gas Pipe Line Co. v. Mobil Gas Service Corp., 1956, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373; United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division, 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

31. On reading the briefs of Amoco and Mobil, one might conclude that they were the only ones who had made private, company-wide settlement agreements. But as the following table reveals, the list is long, and it includes both Shell and Humble:

*Tabulation of Individual Company Settlements*

| | |
|---|---|
| Champlin Oil & Refining Co. | 23 FPC 861 |
| Tidewater Oil Co. | 27 FPC 1267 |
| Ohio Oil Company | 27 FPC 1373 |
| Shell Oil Company | 28 FPC 257 |
| F. A. Callery Inc. Francis A. Callery Callery Properties Inc. | 28 FPC 849 |
| Pure Oil Company | 28 FPC 889 |
| Bel Oil Corp. | 28 FPC 1006 |
| Cities Service Oil Company | 28 FPC 1108 |
| Amerada Petroleum Corp. | 29 FPC 204 |
| R. H. Goodrich | 29 FPC 397 |
| Gulf Oil Corporation | 29 FPC 837 |
| Sinclair Oil & Gas Co. | 30 FPC 5 |
| Hunt Oil Company | 30 FPC 220 |
| Texaco Inc. | 30 FPC 1631 |
| Southwest Gas Producing Company, Inc. | 31 FPC 192 |
| Socony Mobil Oil Co., Inc. (Mobil) | 31 FPC 1101 |
| Sohio Petroleum Co. | 31 FPC 623 |
| Humble Oil & Refining Company | 32 FPC 49 |
| Sun Oil Company | 32 FPC 894 |
| The Atlantic Refining Co. | 32 FPC 933 |
| Union Oil Co. of California | 32 FPC 1336* |
| Pan American Petroleum Co. (Amoco) | 35 FPC 502 |

* Limited to certain dockets.

If the *SoLa II* rates were lower than those established in these agreements, the private settlements would have been worthwhile. As it turns out, FPC was more generous in *SoLa II* than was anticipated. But this clearly furnishes no basis for attack. We have not examined the provisions of any of these private settlements but are informed that many of them also include the forgiveness of substantial refund obligations.

enue for their sales of flowing gas. It is a double-edged sword.

FPC realized that its refund credit program would not benefit all producers equally. The Supreme Court recognized in *Permian* that contiguous, homogeneous molecules of natural gas might, consistent with the terms of NGA, bring different prices. FPC's statutory authority to order refunds is clearly discretionary. § 4(e) of the Natural Gas Act, 15 U.S.C.A. § 717c(e).[32]

In the Hugoton-Anadarko Area Rate Case, 9 Cir., 1972, 466 F.2d 974, our Brothers of the Ninth Circuit reviewed Op: 586, which customized refund obligations to make a particular allowance for the position of the Phillips Petroleum Company. Several parties to this appeal suggest that *Hugoton-Anadarko* is a strong precedent for the exercise of FPC discretion. The Associated Gas Distributors (AGD) suggest that FPC's discretion in Op: 598 is even more sustainable than that in *Hugoton-Anadarko* because (i) in *Hugoton-Anadarko* FPC was motivated to protect the interest of a single private producer, whereas in *SoLa II* the refund provisions give a direct benefit to the industry as a whole, but more significantly a benefit to consumers and the public, and (ii) the refund provisions of *Hugoton-Anadarko* were adopted from the untested settlement proposal whereas the *SoLa II* proposal was subjected to cross-examination and additional evidentiary scrutiny.

On the other hand, the opponents suggest that *Hugoton-Anadarko* is absolutely no authority for what FPC did in Op: 598. Mobil demonstrates that in *Hugoton-Anadarko*, FPC employed a *Grigsby* formula in requiring refunds. MDG suggests that the *Hugoton-Anadarko* refund provisions prevented discrimination against a peculiarly situated producer, while the Op: 598 refund credit fosters discrimination between the various producers. Finally, NYPSC, brightening up a gaseous problem by a navigational figure, suggests that the *de minimus* provisions of *Hugoton-Anadarko*, are "360° out of phase" with FPC action in Op: 598. Taking the effect of the refund credit as a whole, we find that *Hugoton-Anadarko* is authority for the proposition that FPC may tailor its refund orders to the particular needs of the industry in a given area. This it did in Op: 598. If it has traversed 360°, it is back to its original azimuth—it has come full circle. The same rationale which supports FPC's discretion in granting a special dispensation in *Hugoton-Anadarko* likewise supports its discretion in Op: 598. Such is the essence of administrative discretion.[33]

We therefore hold that on the record before us, FPC was acting within the bounds of its discretion when it adopted the refund credit work-off program.[34]

---

32. See also Mesa Petroleum Co. v. FPC, 5 Cir., 1971, 441 F.2d 182; Continental Oil Co. v. FPC, 5 Cir., 1967, 378 F.2d 510; Public Service Commission for State of New York v. FPC, 1964, 117 U.S.App.D.C. 287, 329 F.2d 242, cert. denied sub nom; Prado Oil and Gas Co. v. FPC, 1964, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735.

33. The consumers argue that there is no assurance that the program will inure to the benefit of the aggrieved consumer who would have gotten the refund but for the credit. Op: 598 does provide, however, for a first rejection by the party to whom the obligation is owed. It also requires the producers to discharge at least 50% of their obligation by new commitments to

these customers or receive written refusals of a bona fide offer. We hold that these protections are supported on the record as a whole. And, even assuming there are some minor infirmities, we are unwilling to reject a program which provides an obvious positive stimulant for cultivation of reserve possibilities.

34. We are not unmindful of the suggestion of the named petitioner, *Placid Oil Co.,* that the refund credit system of Op: 598 should be modified by (i) abolishing the restriction that the refund obligations must be worked off through additional comitments solely in SLA, (ii) allowing all, rather than only 50%, of the refund obligations to be reduced through commitments to customers other than

908

## Escalations

In addition to the other customized features which we have already discussed, Op: 598 provides for automatic, periodic escalations of ceiling prices on both flowing and new gas and contingent escalations on the price of flowing gas. The maximum rate for flowing gas will increase .5¢/Mcf on October 1, 1973. The maximum rate for new gas will increase by 1¢/Mcf on October 1, 1974. Some consumer advocates here argue that these automatic escalations are not supported by the empirical cost data upon which FPC based its rate structure. For the reasons which we have outlined in our discussion of the role of costs in FPC's determination of "just and reasonable" rates for both flowing and new gas, see notes 19 & 23 *supra,* we hold that these periodic escalations were a proper subject for the exercise of administrative discretion and clearly fall within that "zone of reasonableness" which we allow FPC on review. See Hugoton-Anadarko Area Rate Case, 9 Cir., 1972, 466 F.2d 974.

The contingent escalations of flowing gas rates are keyed to industry-wide dedication of additional natural gas to the jurisdictional market. All producers may charge an additional .5¢/Mcf when 7½ Tcf of new gas reserves are dedicated to the interstate market. There are also successive half-penny increases when the new reserve dedications on an industry-wide basis reach 11¼ Tcf and later at 15 Tcf. The principal objection to these escalations has already been discussed. Since new reserves committed under the refund credit provisions of Op: 598 may not be used to trigger the industry-wide contingent escalations, the producers with relatively insignificant refund obligations strenuously argue that it is competitively disadvantageous for them to commit new reserves to the

jurisdictional market. "Why should we contribute 7½ Tcf of new reserves to the jurisdictional market for the benefit of the industry as a whole, when our competitors are reaping individual refund credit benefits from their new commitments?" they ask. Of course, the answer is that half a loaf is better than no loaf at all. As we have already shown, an administrative choice is not to be rejected merely because one party may get icing on his cake while another gets only cake. FPC found that the contingent escalation program would tend to encourage producers having refund obligations to commit new reserves to the interstate market. To that considerable extent, the program represents a permissible course of action and instead of exciting protest by consumer groups, it should allay the fears that revenues generated by the increased rates will actually go into exploratory and development drilling for new production and reserves. And for that unnamed new market entrant, for whom much concern is expressed, we fail to see why he would be in the least bit dissuaded from committing new reserves at 26¢/Mcf by the fact that it might allow some of his competitors to raise their 22.375¢/Mcf flowing gas price by a half-penny. In short, we sustain the escalations in full.

## VI. Other Provisions
### Of Moratoria

FPC has attempted to interject a modicum of temporal stability into the rate scheme by imposing a moratorium on increased rate filings under § 4 of the Act in excess of the rates authorized by Op: 598 for a period of approximately 5 years. Mobil challenges this restriction as being violative of § 4. We believe that the provision was clearly a lawful exercise of administrative judgment. Not only is it the last word in

those who would receive the cash refund were it not for the credit program, and (iii) establishing a more particularized system of special dispensations for producers who are unable to discharge

their refund obligations in this alternative manner. These particulars are within the province of FPC's administrative discretion.

the sense of its innate authoritativeness, but what the Supreme Court said is the latest and finest word:

> Certain of the producers urge that §§ 4 and 5 must in combination be understood to preclude moratoria upon filings under § 4(d). They assert that the period of effectiveness of a rate determination under § 5(a) is limited by § 4(e); they reason that § 4(d) creates an unrestricted right to file rate changes, and that such changes may, under § 4(e), be suspended for a period no longer than five months. If this construction were accepted, it would follow that area proceedings would terminate in rate limitations that could be disregarded by producers five months after their promulgation. The result, as the Commission observed, would be that "the conclusion of one area proceeding would only signal the beginning of the next, and just and reasonable rates for consumers would always be one area proceeding away." 34 FPC, at 228.

*Permian, supra,* 390 U.S. at 779, 88 S. Ct. at 1376, 20 L.Ed.2d at 343. See also *SoLa I:* 429–430.

There are also other substantial reasons for rejecting the producers' attack on the moratoria provisions. The marrow of their argument is that due to inflation and other economic factors, costs are very likely to rise substantially during the term of the moratorium. But two safeguards convince us that, if and when that contingency occurs, FPC is ready, willing, and able to make appropriate adjustments. First, the costing on 1969 data was relatively current and to a significant degree, the incentives established by Op: 598 apart from the rates themselves serve to bolster the financial position of the producers and protect them against rising costs. These are, of course, the provisions providing for the retention of large amounts of capital through the refund discharge program and the periodic and contingent escalations. Second, there are several alternative methods by which

a single aggrieved producer may establish higher rates as his circumstances warrant. See Part VII, *infra*. Thus, the system is so structured that FPC can retain industry and area wide rate stability for a period of at least five years while simultaneously protecting the financial integrity of the individual producer. And if the change in circumstances is so widespread that the area rate is no longer economically feasible as set, FPC has the power to lift its moratorium or establish new area rates, or both.

For these reasons we hold that the moratoria provisions of Op: 598 are an appropriate exercise of administrative discretion supported by "substantial evidence on the record as a whole".

### Casinghead Gas

Casinghead gas has traditionally been the by-product of the often more lucrative search for oil. In both *SoLa II,* Op: 598, and the Texas Gulf Coast Area Rate Case, Op: 595, FPC has abandoned any distinction in maximum permissible rates of gas on the basis that some of it may be associated with the production of oil. We believe that several considerations support this course of action: (i) "the exigencies of administration demand the smallest possible number of separate area rates", *Permian, supra,* 390 U.S. at 761, 88 S. Ct. at 1357, 20 L.Ed.2d at 333, (ii) there is a serious problem of allocating the proper amount of exploration and development expenses between oil and gas, see *SoLa I:* 428 F.2d 422 n.30, (iii) imposing a lower price on casinghead gas might " 'invite the divergence of such gas to the intrastate market,' " Op: 598, ¶ 167, and (iv) making the production of casinghead gas economically unfeasible might encourage profit-minded producers to flare it rather than market it —thus making natural gas in SLA not merely a wast*ing* but a wast*ed*, asset. Worse, perhaps this would excite every nearby camper, hiker, and nature lover into a hoped-for class action to add the further, and unneeded complication of

an EPA impact statement in every FPC certification rate case. Cf. Harrington Manufacturing Co. v. White, 5 Cir., 1973, 475 F.2d 788. For all of these reasons, we believe that FPC acted within the bounds of administrative propriety in abandoning any such distinction.

## Bastian Bay

 In Op: 598, ¶ 166, FPC specifically excluded from the applicability of its order the "just and reasonable rates" for the Rayne Field and Bastian Bay sales. No party seriously contends that it would be appropriate for FPC to include the Rayne Field proceeding, which is now pending review in the D.C. Circuit. But Amoco strenuously contends that it was error for FPC to exclude from the provisions of Op: 598, the rates for its largest delivery of natural gas, i. e. Bastian Bay.

FPC and two intervening parties, Humble and the Pipe Line Purchaser Group seek to justify this exclusion. Their arguments are essentially two. They argue that it is within the authority of FPC to delineate the scope of its own proceedings. They also contend that Amoco is premature in its objections since there is no indication that its Bastian Bay sale will receive disparate treatment, and indeed, FPC's actions with regard to the Rayne Field proceedings would tend to indicate that the Bastian Bay transaction will be given every benefit allowed to other producers under the terms of Op: 598.

We find this reasoning to be very persuasive. The Bastian Bay commitment is not necessarily of the same genre as the typical wellhead sale of an Mcf of gas. Cf. United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466; Continental Oil Co. v. FPC, 5 Cir., 1966, 370

F.2d 57, cert. denied, 1967, 388 U.S. 910, 87 S.Ct. 2114, 18 L.Ed.2d 1349. It is a lump sum sale of in-place reserves. Thus, there are significant pragmatic reasons to justify FPC's separate treatment. But this conclusion does not in any way foreshadow any particular resolution on the merits. On the contrary, we leave the ultimate merit determination of maximum permissible rates for delivery of natural gas at Bastian Bay to the specific expertise of FPC. Naturally, this also leaves to Amoco all available administrative and judicial remedies. Our refusal to take requested specific action is a recognition that enforcement of Op: 598 does not cut off Bastian Bay interest holders from further relief completely unfettered by the refusal of FPC (or us) to take care of it now.

## The Division Date Between New and Flowing Gas: October 1, 1968

 The Municipal Distributors Group (MDG), as a corollary of its argument that flowing gas may not be made to bear a portion of the burden for exploration and development of new natural gas reserves, urges that the administratively chosen division date of October 1, 1968, is not supported on the basis of the record. FPC has employed this date in most of its area rate cases.[35] Producers in SLA were initially put on notice when SoLa II proceedings first commenced that new gas rates might be subject to future alterations. We fail to see how this purely administrative matter could possibly have prejudiced any party.

## Royalty Payments

Mobil attacks the royalty component of the rate calculations on the basis of its putative inadequacy.

35. Because the Hugoton-Anadarko Area Rate Case, Op: 586, aff'd., 9 Cir., 1972, 466 F.2d 974, adopted the terms of a settlement proposal, a different date was chosen. The October 1, 1968 date was used by FPC in the Texas Gulf Coast Area Rate Case, Op: 595, and the Other Southwest Area Rate Case, Op: 607, however. Since there is a great degree of overlapping, not only from the administrative angle, but also of producers, we believe that this practice will facilitate more efficient regulation by FPC.

It all started with J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104, and Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, where we referred to FPC's primary jurisdiction the issue of whether gas royalties are "sales of gas for resale in interstate commerce." FPC answered affirmatively, thereby subjecting the royalties to FPC administrative ceilings. In Mobil Oil Corp. v. FPC, 1972, 149 U.S.App.D. C. 310, 463 F.2d 256, cert. denied sub. nom., 1972, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676, the D.C. Circuit reversed. Since the royalty contracts are not, under this decision, subject to the same administrative jurisdiction as the producer's rates, Mobil argues that the rate schedule fails to take account of the possibility that royalty obligations might require a greater portion of the new rate than FPC thought.

■ Of course the royalty obligations of the producers are cost components of the rate structure. Any alteration of this component would necessarily alter the departure point of the rate calculations. And under the holding of the D.C. Circuit in *Mobil,* this would be an *Erie* determination of the contract stating the royalty percentage based upon the applicable principles of state law— totally beyond the control of the federal regulatory agency charged with the responsibility of regulating natural gas rates.

■ But we are not willing to alter or stay the implementation of area wide rates for the entire industry merely on the basis of what *might* happen to *some* producers' costs *if* this statement of the law prevails.

If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition FPC for individualized relief. *Permian* contemplated it. FPC has on occasion given it. E. g., Op: 649,

"Opinion and Order Granting Special Relief and Terminating Proceedings" (February 21, 1973). And we find it to be far preferable to speculative prophesies of future royalty components. If the royalty obligations are such as to make the rates established by Op: 598, and approved by us here, confiscatory or otherwise inappropriate, those producers who are materially affected will certainly have recourse to the administrative process. And, as with the moratoria provisions, if FPC determines that future events substantially change the rate structure for the industry as a whole, it may make appropriate changes.

### Charges for the Transportation of Liquids and Liquefiable Hydrocarbons

■ Op: 598 established minimum transportation rates to be paid by the producers to pipelines who may transport liquid or liquefiable hydrocarbons in conjunction with the sale of natural gas.[36] The rate is attacked by Mobil as being too high, and by NYPSC as being too low. We have examined the testimony regarding this matter and conclude that FPC had a substantial evidentiary basis from which it could conclude that the particular rates which it established should supply a reasonable floor on these charges. This answers Mobil's objection. As to NYPSC's contention that the allowance is not high enough, we only need point out that the established rates are merely "minimums". The pipelines are certainly free to bargain for higher rates if they wish.

This provision of Op: 598 is affirmed.

### The Effective Date of New Gas Rates

■ FPC ordered, as part of the entire rate scheme, each producer in SLA to file certain data within 20 days from the date of Op: 598. It also provided that producers who filed within this 20

36. The minimum charges are .02¢/Mcf/mile for liquefiable hydrocarbons and 20¢/barrel for liquids. Significantly, in Order No. 449 (January 31, 1972) FPC adopted these same rates in its Docket No. R–338 directed solely to this matter.

day period for increased rates could put these rates into effect 65 days from the date of FPC's order, as long as the rates comported with the provisions of their respective contracts, and fell below the ceilings established for the area. Any rate increase not filed within the 20 day period could not become effective until 90 days from the date of the filing. Both Amoco and Mobil suggest that in so ordering FPC has overstepped the bounds of its authority under § 4.

 The applicable provisions of § 4 state:

> *"Unless the Commission otherwise orders,* no change shall be made by any natural-gas company in any such rate \* \* \* except after thirty days' notice to the Commission and to the public."* (Emphasis added)

§ 4(d) of the NGA, 15 U.S.C.A. § 717c(d).

The thrust of the argument is that FPC's authority to delay the effectiveness of rate filings under § 4 only applies *before* a given rate has been determined to be "just and reasonable". But this clearly ignores the first phrase of § 4(d). Under this phrase, FPC has the authority to "otherwise order". And, in adopting the entire settlement proposal as its decision on the merits, FPC did so order. Because we are unable to state to what extent FPC might have altered or modified the effective date if it had dredged out all of the provisions of the rate scheme, we refuse to tamper with this administrative decision.[37]

 In sum, we hold that Op: 598, now immutably dubbed as *SoLa II,* was fully supported by "substantial evidence on the record as a whole".

## VIII. An Anchor-to-Windward

There has never been unanimous support in any forum for FPC regulation of natural gas rates by way of the area rate method. Indeed, when the Supreme Court first sanctioned FPC's abandonment of the individual producer cost-of-service method of rate calculation in Phillips, II, Wisconsin v. FPC, 1963, 373 U.S. 294, 315, 83 S.Ct. 1266, 1278, 10 L. Ed.2d 357, the vote was five to four with Justice Clark filing a lengthy dissent which he introduced with the following observation: "The Sisyphean labors of the Commission continue as it marches up the hill of producer regulation only to tumble down again with little undertaken and less done." When the Court later specifically upheld the area rate method in *Permian* Justice Douglas filed a dissenting opinion to demonstrate some of the specific economic problems which area ceilings based upon the costs of the non-existent "average" producer might have when applied to various individual producers. Broadly condemning a system based on averages with no assurance that they were "typical" or "representative" data, he said:

> "The average per capita income of a Middle East kingdom is said to be $1800 a year. But since one man—or family—gets most of the money, $1800 a year describes only a mythical resident of that country."

390 U.S. at 835, 88 S.Ct. at 1396, 20 L. Ed.2d at 375.

 Nevertheless, the thrust of *Permian* is that FPC is free to make an administrative determination which it believes will foster the most efficient and thorough regulation of natural gas rates. The method which it chose in *Permian* and *SoLa I* and *II* is the area rate method.

But FPC is not committed solely to that approach. It, too, realizes that individual circumstances may often warrant specialized relief. In Order No.

---

37. Mobil contends that FPC's capitulation on the effective date in both the Texas Gulf Coast Area Rate Case, Op: 595, and Other Southwest Area Rate Case, Op: 607, precludes it from adhering to its original order in Op: 598. Of course, one factor which differentiates the present case from those is that here FPC adopted the total rate scheme proposed by the parties. But we do not want to overemphasize this element, for we hold that it is within the bounds of administrative discretion for FPC to make its adjustments as it views each separate case.

455, issued in Docket No. R–441 on August 3, 1972, FPC promulgated 18 C.F.R. § 2.75, "Optional Procedure for Certificating New Producer Sales of Natural Gas".[38] Under this new procedure contracting parties may seek a permanent certificate of public convenience and necessity for the sale of post-April 6, 1972, gas at rates in excess of the applicable area rate ceiling and not subject to refund, see FPC v. Sunray DX Oil Co., 1968, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388, if FPC determines that rate to be in the public interest.

One cannot read Order 455 without recognizing that FPC is struggling to provide a sufficiently flexible administrative structure to accommodate all producers of natural gas, and vicariously, the public demand. FPC is quick to point out that the procedure adopted in Order 455 is meant merely to supplement, not supplant, the area rate method. But it is a comforting reassurance to a court that has demonstrated so many times its inability to review rate determinations with infallible omniscience to know that there are alternative methods by which producers who are unable to exist in the economic clime of the area rate ceilings may get administrative consideration of the merits of their claims.

Order 455 is limited to very "new", i. e. post-April 3, 1972, gas. But it is not the only method available. FPC informs us that producers may also seek redress

by (i) directly petitioning FPC to make a special allowance for a deviation from area rate ceilings as contemplated by *Permian,* see e. g., George Mitchell and Associates, Op: 649, "Opinion and Order Granting Special Relief and Terminating Proceedings", —— F.P.C. —— (February 21, 1973); (ii) filing for the certification of emergency purchases under the provisions set forth in Order 431, 45 F.P.C. 570 (April 15, 1971);[39] (iii) applying for an initial certification of a sale in excess of area rates, but subject to the later determination of area rates under the terms of the Statement of Policy, ¶ 12, in Docket No. R–389A, 35 Fed.Reg. 11638 (July 17, 1970); or (iv) any one of several other methods.[40]

The presence of these alternatives should serve to alleviate any problems engendered by the area approach. They certainly provide great comfort to us in our role as a court compelled to review the area rate determinations, and furnish us with additional support for our decision today.

Op: 598 is sustained in full.

Enforced.

### ON PETITIONS FOR REHEARING

### PER CURIAM:

Of the 49 various parties and intervenors who entered formal appearances in this case, only two—Mobil and Amoco

38. Order 455 is now pending judicial review in the D.C. Circuit, Moss v. FPC, [No. 72–1837] and APGA v. FPC. [No. 72–1846]. Accordingly we express no opinion as to its validity.

This result was achieved through FPC's rule-making powers, and without the extensive hearings with which it has previously been encumbered. FPC is also using this abbreviated type proceeding for some of its area rate determinations. See Phillips Petroleum Co. v. FPC, 10 Cir., 1973, 475 F.2d 842 where the Tenth Circuit approved the procedure.

39. There have been 62 separate certifications of sales committing a total of about 500 billion cubic feet of gas to the interstate market at rates ranging from 26 to 40¢/Mcf since this Order 431 procedure was authorized by FPC. In Order 455, FPC suggested that one of the main problems with the Order 431 procedure was that it delayed administrative action until an emergency situation had been reached. The optional procedure established by Order 455 would hopefully solve the problem in its incipiency.

40. FPC has continued, for example, to exempt "small producer sales" from area rate regulation. See Order 428, 45 F.P.C. 454 (1971).

We are very impressed by the pragmatic and flexible manner in which FPC has approached natural gas rate regulation as a whole.

**914**

—have petitioned the Court for rehearing.

Both of these parties contest our statement that "no party [20] directly challenges this [new gas] rate as being too low." [at p. 900]. On reconsideration, we believe that the statement might be somewhat misleading. Accordingly, it shall be deleted from the opinion and the following sentence shall be inserted in its place: "Of all the various parties [20] and interests represented in this case, only Mobil and Amoco suggest that this rate is too low."

In all other respects, it is ordered that the petitions for rehearing filed in the above entitled and numbered cause be and the same are hereby denied.