**FEDERAL ENERGY REGULATORY COMMISSION, Appellant,**

v.

**TRITON OIL & GAS CORPORATION.**

No. 82–2157.

United States Court of Appeals, District of Columbia Circuit.

Argued June 2, 1983.

Decided July 19, 1983.

Joel M. Cockrell, Atty., F.E.R.C., Washington, D.C., with whom Charles A. Moore, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., were on brief, for appellant.

Bernard A. Foster, III, Washington, D.C., with whom Jacob Goldberg, Washington, D.C., was on brief, for appellee.

Before ROBINSON, Chief Judge, and WRIGHT and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Federal Energy Regulatory Commission[1] (FERC or Commission) appeals from a decision of the district court summarily dismissing its claim for injunctive relief against appellee Triton Oil and Gas Corporation (Triton) for failure to make certain refunds to purchasers of its natural gas and to report those refunds as required by several prior Commission orders. The district court held that Triton did not have a legal duty to make such refunds and reports. The court interpreted the prior Commission orders to impose refund and reporting duties only on those producers of natural gas that had been charging and collecting rates subject to the *explicit* refund obligations of § 4(e) of the Natural Gas Act of 1938 (Act), 15 U.S.C. § 717 *et seq.*, a category that does not include Triton. Because we believe that the Commission orders in question are not so restricted and that Triton has an obliga-

---

1. The jurisdiction of the Federal Power Commission over wholesale electric power rates was transferred to the Federal Energy Regulatory Commission by the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (Aug. 4, 1977), 42 U.S.C. § 7172(a)(1)(B), and Executive Order No. 12009, 42 Fed.Reg. 46,267 (1977).

tion under those orders to make refunds and file reports with the Commission, we reverse the order of the district court and remand for further proceedings.

## I. BACKGROUND

Under the Natural Gas Act of 1938, the FERC has the authority to regulate interstate sales of natural gas by setting "just and reasonable" rates, § 5(a), 15 U.S.C. § 717d(a), for the "sale in interstate commerce of natural gas for resale for ultimate public consumption ...," § 1(b), 15 U.S.C. § 717(b). Because the Act's provisions do not specifically cover producers or wellhead sales of natural gas, the Commission initially declined to regulate sales by independent producers[2] to interstate pipelines. *Public Service Commission v. Mid-Louisiana Gas Co.,* — U.S. —, —, 103 S.Ct. 3024, 3030–3031, 77 L.Ed.2d 668 (1983); *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 302, 94 S.Ct. 2328, 2342, 41 L.Ed.2d 72 (1974); *Permian Basin Area Rate Cases,* 390 U.S. 747, 755–56, 88 S.Ct. 1344, 1353–54, 20 L.Ed.2d 312 (1968). In 1954, however, the Supreme Court held that independent producers are "[n]atural-gas compan[ies]" within the meaning of § 2(6) of the Act, 15 U.S.C. § 717a(6),[3] and therefore are subject to regulation by the Commission. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

Following this decision, the Commission attempted to determine whether the rates of independent producers were "just and reasonable" by applying a traditional regulatory approach, using individualized costs of service as a basis for determining price.

It quickly found this approach, however, impossible to administer because of the sheer numbers of independent producers engaged in natural-gas sales. *Public Service Commission v. Mid-Louisiana Gas Co.,* — U.S. at —, 103 S.Ct. at 3030; *Mobil Oil Corp. v. FPC,* 417 U.S. at 303–04, 94 S.Ct. at 2343–44; *Permian Basin Area Rate Cases,* 390 U.S. at 756–57, 88 S.Ct. at 1354–55. As a result, in the early 1960's the Commission decided to set rates by area. It established several discrete geographical areas within which it believed that costs and general operating conditions were reasonably similar and set out to determine, through hearings and compilation of data, uniform rate schedules that would govern all producers within each area. *Public Service Commission v. Mid-Louisiana Gas Co.,* — U.S. at —, 103 S.Ct. at 3030; *Mobil Oil Corp. v. FPC,* 417 U.S. at 304, 94 S.Ct. at 2343. In *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 the Supreme Court sustained the constitutional and statutory authority of the Commission to adopt this system of area regulation in the discharge of its responsibilities under the Natural Gas Act to determine whether producers' rates are just and reasonable.

The Southern Louisiana area[4] is one of the seven geographical areas defined by the Commission for the purpose of prescribing areawide price ceilings.[5] The Commission first instituted proceedings to establish an area rate structure for the Southern Louisiana area on May 10, 1961. *Area Rate Proceeding, Docket No. AR61–2 ...,* "Order Instituting Rate Proceeding for the Southern Louisiana Area, Consolidating Proceedings and Prescribing Preliminary Proce-

---

**2.** Independent producers are producers who do "not engage in the interstate transmission of gas from the producing fields to consumer markets and [are] not affiliated with any interstate natural-gas pipeline company." *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 675, 74 S.Ct. 794, 795, 98 L.Ed. 1035 (1954).

**3.** Section 717a(6) provides:

"Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

**4.** The FPC defined this area to include all parts of Louisiana south of the thirty-first parallel, together with all offshore territory in the federal domain that would be bounded by the Louisiana borders extended into the Gulf. *Southern Louisiana Area Rate Cases v. FPC,* 428 F.2d 407, 418 (5th Cir.1970) (SoLa I).

**5.** The other six areas are the Permian Basin, Texas Gulf Coast, Hugoton-Anadarko, Other Southwest, Appalachian and Illinois Basin, and Rocky Mountain areas. *See Mobil Oil Corp. v. FPC,* 417 U.S. 283, 289–90 n. 3, 94 S.Ct. 2328, 2336–2337 n. 3, 41 L.Ed.2d 72 (1974).

dure," 25 F.P.C. 942 (1961). All producers of natural gas in the area, including Triton, through its predecessors-in-interest, *see* FERC Brief, Appendix B, were named respondents to the proceedings. In addition, in the order instituting the proceedings, the Commission consolidated a number of filings by area producers for rate increases under § 4(e) of the Act, 15 U.S.C. § 717c(e),[6] because those producers might have been charging and collecting rates that would be declared "unjust, unreasonable, unduly discriminating or preferential" in the main proceedings. 25 F.P.C. at 943.

The initial hearing on rates for the Southern Louisiana Area ended in 1965, and the Presiding Examiner issued his decision in 1966. *Southern Louisiana Area Rate Cases v. FPC,* 428 F.2d 407, 418–19 (5th Cir.1970) (*SoLa I*). The Commission rendered its decision in 1968, Opinion No. 546, 40 F.P.C. 530 (1968), which it modified on rehearing in 1969, Opinion No. 546–A, 41 F.P.C. 301 (1969). In Opinion No. 546 and 546–A the Commission (1) established a multi-tiered rate structure for sales of natural gas (the more recent the contracts for interstate sale of gas, the higher the price); (2) ordered the producers whose § 4(e) proceedings it had consolidated with the main case to make refunds (totaling approximately $375 million) on the basis of the difference between the pre-October 1, 1968, rates established in Opinion No. 546 and the actual rates collected; and (3) imposed a five-year moratorium on rate increases above those set in the new rate structure. 40 F.P.C. 530. Although Opinions No. 546 and 546–A did not require producers whose rates were not subject to § 4(e) to make refunds for payments collected under pre-October 1, 1968, contracts, they did set new maximum rates for gas contracted for after October 1, 1968, binding on all producers of natural gas in the Southern Louisiana area.

Opinions No. 546 and 546–A were appealed to the Fifth Circuit Court of Appeals. In May 1969, pending that court's decision, both the Fifth Circuit and the Commission stayed the rates promulgated in the opinions.[7] *Area Rate Proceeding* ..., "Order Staying Rate Reductions," 41 F.P.C. 675 (1969). On December 15, 1969, shortly before oral argument in the Fifth Circuit case, the Commission instituted new proceedings (Docket No. AR69–1) to reconsider all major actions it had taken in Opinions No. 546 and 546–A because of the possibility of a nationwide natural-gas shortage. *SoLa I,* 428 F.2d at 421. Determining that the new proceedings should have no effect upon its review, the Fifth Circuit affirmed Opinions No. 546 and 546–A. It also specifically declared, however, that its affirmance should not "be interpreted to interfere with Commission action that would change the rates we have approved here." *Id.* at 444–45.

Following the issuance of *SoLa I,* various petitions for rehearing were filed. In the course of its deliberations on those petitions, the court directed certain questions to the Commission by letter. The Commission filed its response in May 1970, advising the Court of Appeals that, among other things, the Commission believed it has "no authority to prescribe or permit retroactive rate changes ... unless the reviewing Court otherwise directs." Opinion No. 598, 46 F.P.C. 86, 99–100 (1971).

In its opinion denying rehearing, the Fifth Circuit stated unequivocally that it *had* "otherwise directed," writing that the Commission had the authority "to reopen *any* part of its order that circumstances require be reopened." *Southern Louisiana Area Rate Cases,* 444 F.2d 125, 126–27 (5th Cir.1970) (per curiam) (emphasis in original). The Commission thereupon formally reopened the 1961 area rate proceedings (Docket No. AR61–2), consolidated them

---

**6.** Section 4(e) allows the requested rate changes to go into effect, but also authorizes the Commission to order such producers "to refund, with interest, the portion of such increased rates or charges ... found not justified."

**7.** The Commission apparently never attempted to force implementation of the rates set in Opinions No. 546 and 546–A prior to those stays.

with the new proceedings (Docket No. AR69–1), and continued the stay of Opinions No. 546 and 546–A.[8] *Area Rate Proceeding* ..., "Order Reopening and Consolidating Area Rate Proceedings and Establishing Procedures," 44 F.P.C. 1638 (1970). In addition, a settlement proposal agreed to by the majority of the consumer, pipeline, and producer interests involved in the proceedings was made a part of the record in the newly consolidated proceedings. *Id.* at 1639.

In Opinion No. 598, issued on July 16, 1971, the Commission adopted the proposed settlement, concluding that its terms were just and reasonable and supported by substantial evidence in the record. Opinion No. 598, 46 F.P.C. at 110, 131, 137–38, 142. As a consequence, effective August 1, 1971, the Commission changed the three-tier rate schedule established in Opinions No. 546 and 546–A to two tiers (for contracts dated prior to October 1, 1968, and for those dated on or after that date) and raised the maximum rates above the rates set out in those opinions. The Commission also accepted the agreement's stipulated refund obligation of $150 million, a sizable reduction from the approximately $375 million that the Commission had calculated would be due under Opinions No. 546 and 546–A. In addition, the approved settlement refund formula, which explained how to calculate the monies due for four different time periods, included refunds for deliveries *after* as well as before October 1, 1968. *Id.* at 142, 145. Opinion No. 546, which was to become effective and set new rates as of October 1, 1968, only imposed refunds on gas sales under pre-October 1, 1968, contracts.

Like their predecessors, Opinions No. 598 and 598–A (which modified Opinion No. 598 on rehearing, 46 F.P.C. 633 (1971)), were appealed to the Fifth Circuit Court of Appeals, which affirmed their validity. *Placid Oil Co. v. FPC,* 483 F.2d 880 (5th Cir.1973) (*SoLa II*). In turn, the Supreme Court affirmed *SoLa II,* finding, *inter alia,* that

the Commission had the authority to change the rates and refund obligations set out in Opinions No. 546 and 546–A even though those opinions had been affirmed by the Fifth Circuit. *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72.

## II. Proceedings Below

In 1975 and 1977 the Commission directed the disbursement of refunds ordered in Opinions No. 598 and 598–A. *Area Rate Proceeding* ..., "Order Directing Disbursement and Flow-Through of Refunds," 59 F.P.C. 2238 (1977). In 1978, the Commission issued an order stating that its records did not reflect receipt of refund disbursement reports from certain rate proceedings, including the Southern Louisiana proceedings. *H.N. Burnett et al.,* 3 FERC ¶ 61,223 (1978). The order required the producers identified in the order either to disburse the monies owed and file reports to that effect with the Commission or to show cause why they should not be held in violation of lawful orders issued pursuant to the Natural Gas Act. *Id.*

The order to show cause identified two Triton rate schedules as being subject to refund obligations. On July 5, 1978, Triton responded to the order, stating that after issuance of Opinion No. 598 it had determined that it did not owe any refunds, even though it had previously indicated that it had refund obligations under two other rate schedules. Joint Appendix (J.A.) at 43. On July 21, the Commission informed Triton that it believed Triton had refund obligations with respect to all four of its rate schedules. *Id.* at 19–21. On December 20, the Commission's Office of Enforcement requested Triton to comply with the Commission's orders. *Id.* at 28–29. Triton responded on January 9 and February 8, 1979, reiterating that it had no outstanding refund obligations under any of its rate schedules. *Id.* at 49–50, 50B–50C.

The Commission filed a complaint for injunctive relief in district court on April 6,

---

**8.** In its opinion in *SoLa I,* the Fifth Circuit dissolved its stay of Opinions No. 546 and 546–A, without prejudice to the Commission's power er to continue its own stay of the opinions. 428 F.2d at 445.

1979, seeking to enjoin Triton's continuing failure to make refund disbursements and reports to the Commission in violation of agency rules, regulations, and orders, including Opinions No. 598 and 598–A and the 1978 order to show cause. Specifically, the Commission alleged that Triton was obligated to make refunds for rates charged on the sale of its gas from October 1, 1968, through January 1, 1971—a period of time occurring prior to the date on which Opinion No. 598 became effective. On July 27, 1982, the district court entered summary judgment in favor of Triton and against the Commission. The court held that Opinion No. 598 applied *prospectively* from its effective date in 1971 to all respondents to the area rate proceedings, but *retroactively* only to a more limited group—those producers who had had their § 4(e) filings consolidated with the main proceedings that culminated in Opinions No. 546 and 546–A and who therefore had been collecting rates subject to an explicit refund contingency. Because Triton was not such a § 4(e) producer, the court concluded, it had no duty to make refunds for the period in issue, October 1, 1968, to January 1, 1971. *Id.* at 144–55. This appeal followed.

### III. ANALYSIS

The FERC argues on this appeal that the district court erred in holding that Opinions No. 598 and 598–A did not impose a legal obligation upon Triton to make refunds for the period October 1, 1968, to January 1, 1971. It reasons, first, that the Commission had full legal authority to require refunds for this time interval from *all* producers of natural gas in the Southern Louisiana area, whether or not those producers had been collecting rates subject to explicit refund contingencies, and, second, that the Commission's orders clearly imposed such a refund duty on Triton. We will examine each of these arguments in turn.

### A. *The FERC's Authority*

As we noted above, the district court held that Triton was not subject to refund obligations under Opinions No. 598 and

598–A because (1) prior to the issuance of those opinions, Triton had collected rates pursuant to permanent certificates of public convenience and necessity not subject to refund conditions, and (2) the Commission can order refunds only when the producer has been collecting payments for gas subject to such refund conditions. J.A. at 151. The Commission contends that this ruling is erroneous and must be reversed because both the Fifth Circuit Court of Appeals in *SoLa I,* 428 F.2d 407, and *SoLa II,* 483 F.2d 880, and the Supreme Court in *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72, held that the Commission had clear authority to prescribe a rate schedule for the Southern Louisiana area different from those rates found to be just and reasonable in Opinions No. 546 and 546–A. The Commission also argues that these decisions held that it could make the new rate scheme effective as of October 1, 1968, the date Opinion No. 546 was originally scheduled to become effective.

Triton does not contest the validity of Opinions No. 598 and 598–A. Instead, it contends that the Commission lacks the power to order it to pay refunds for the period October 1, 1968, to January 1, 1971, because (1) Opinion No. 598 has an effective date of August 1, 1971, rather than October 1, 1968, when Opinion No. 546 was scheduled to become effective, and therefore producers operating under permanent certificates are only bound to operate under new rates from 1971; (2) the Commission does not have retroactive ratemaking authority and cannot impose refunds of rates collected by producers pursuant to final, unconditioned, permanent certificates; (3) the Fifth Circuit's mandate went only to the Commission's power to reopen and, if necessary, set aside the rates and refunds set out in Opinions No. 546 and 546–A but not to its power to impose refund obligations retroactively on all Southern Louisiana area producers; and (4) Opinions No. 598 and 598–A resulted from a settlement proposal to which Triton was not a party, which it did not support, and to which it therefore cannot be subject. Brief of Appellee at 21–30.

We agree with the Commission that the Fifth Circuit's opinions in *SoLa I* and *II* and the Supreme Court's affirmance of *SoLa II* in *Mobil Oil Corp. v. FPC* recognize that the Commission has the power in this case to order retroactive rate changes. Those decisions permit the Commission to require *all* producers of natural gas in the Southern Louisiana area who sold their gas at rates above those found to be just and reasonable in Opinions No. 598 and 598–A to make downward rate adjustments from the time of Opinion No. 546's effective date, October 1, 1968, and to refund any monies collected since that date at rates above those set out in the refund provisions of the 1971 opinions. In *SoLa I,* the Fifth Circuit, while sustaining Opinions No. 546 and 546–A "in full," stated that "the mandate of this Court should not, however, be interpreted to interfere with Commission action that would change the rates we have approved here." 428 F.2d at 444–45. Following this decision, various petitions for rehearing were filed. As we noted above, while the Fifth Circuit was considering these petitions, the Commission advised the court that it did not have the authority to prescribe retroactive rate changes unless the court directed otherwise. Opinion No. 598, 46 F.P.C. at 99–100. In its decision denying rehearing, the Fifth Circuit explicitly informed the parties that it *was* directing otherwise:

> Our affirmance of the Commission's orders is structured so as to allow the Commission great flexibility.... To this end, we indicated that the Commission had authority under section 16 of the Natural Gas Act to stay, modify or rescind any part of its order, notwithstanding our affirmance, if circumstances appearing since the issuance of the orders make a change advisable. Petitioners on rehearing, however, have argued to this Court that the Commission may exercise this power *prospectively* only; that is, petitioners argue that affirmance by this Court would preclude the Commission from reexamining revenues from gas that has already been delivered. We wish to make crystal clear the authority of the

Commission in this case to reopen *any* part of its order that circumstances require be reopened. Under section 19(b) of the Natural Gas Act, this Court has the broad remedial powers that inhere in a court of equity, and pursuant to our equitable powers we make it part of the remedy in this case that the *authority of the Commission to reopen any part of its orders, including those affecting revenues from gas already delivered, is left intact. The Commission can make retrospective as well as prospective adjustments in this case if it finds that it is in the public interest to do so.*

> At the same time, we emphasize that our judgment is an affirmance and not a remand. The appropriate place for originally considering what parts of the orders must be reopened in light of new evidence is before the Commission.

*Southern Louisiana Area Rate Cases,* 444 F.2d at 126–27 (emphasis in last part of first paragraph added).

The Fifth Circuit reiterated this position in *SoLa II,* noting that it had already stated in *SoLa I* that "we took careful pains, especially in the opinion on rehearing, to make sure that our affirmance of the Op: 546 rate structure would not impair FPC's authority to formulate a more flexible plan if the need arose.... [W]e categorically rejected the notion that the label 'affirmance' could possibly impair FPC's ability to alter or modify *any* of the provisions, particularly the refund provisions, of its *SoLa I* rate scheme if it believed that the exigencies of the gas industry required more effective remedial measures." 483 F.2d at 888, 904.

*SoLa II* was then appealed to the Supreme Court. Two of the petitioners— groups representing major consumer interests—again argued that the Commission had no authority to change rates and refund obligations fixed in Opinion No. 546 after that opinion was affirmed in *SoLa I.* The Court rejected that argument, stating that the Fifth Circuit did not exceed its powers "under § 19(b) 'to affirm, modify, or set aside [an] order in whole or in part'" when it held that the Commission was fully

authorized to reopen any part of Opinions No. 546 and 546–A that seemed appropriate and necessary in light of new evidence as to a future natural-gas supply problem. *Mobil Oil Corp. v. FPC,* 417 U.S. at 311, 94 S.Ct. at 2347. Section 19(b), the Court wrote, "provides that the Court of Appeals may authorize the Commission in proper cases to take new evidence, upon which the Commission may modify its findings of fact and make recommendations concerning the disposition of its original order. Under the Court of Appeals disposition, the 1968 order was therefore not final and thus it was within the power of the Commission to reconsider and change it." *Id.* at 311–12, 94 S.Ct. at 2347–48.

Opinions No. 546 and 546–A, as we pointed out above, were subject to several judicial and administrative stays and never took effect. In at least one of those stays, the Commission stated that "[e]ach respondent to these proceedings shall, upon order of the Commission after any dissolution of this stay or any extension thereof, be obligated to pay or cause to be paid to the persons adjudged to be entitled thereto the amounts representing the aggregate reduction in rates and charges which would result from making the prescribed area rates effective as of October 1, 1968." *Area Rate Proceeding,* "Order Staying Rate Reductions," 41 F.P.C. at 676. Thus, the rates set by Opinions No. 546 and 546–A, which had already been judicially affirmed in *SoLa I,* were merely held in abeyance while the Commission decided whether or not to modify them. Had it decided not to modify those rates, the rates would have been effective as of October 1, 1968. Triton would then clearly have been required to adjust its rates downward and make refunds from that date. *See SoLa I,* 428 F.2d 421 n. 27 ("[t]he maximum rates that the Commission has set [in Opinions No. 546 and 546–A] ... are to remain in effect throughout the new proceeding, which may last for years"). Instead, the Commission *did* modify the rates *upward* in its Opinions No. 598 and 598–A, as both the Fifth Circuit and the Supreme Court explicitly allowed it to do. As a consequence of the refund provisions of

Opinions No. 598 and 598–A, producers of natural gas in the Southern Louisiana area will receive greater revenues for the period from October 1, 1968, to January 1, 1971, than if Opinions No. 546 and 546–A had actually been put into effect. We see nothing inequitable in this case in asking those producers, who have been on notice since 1968 that their rates could be readjusted downward to the rates set in Opinions No. 546 and 546–A as of October 1, 1968, to pay refunds on the revenues received by charging higher rates. This is particularly true since they clearly benefited from the reconsideration. Any other conclusion would mean that no Commission-approved rate formula could have been implemented as of 1968, even if the Commission had finally determined not to revise the rates set out in Opinions No. 546 and 546–A. We are convinced that that result could not possibly have been the Fifth Circuit's intent in *SoLa I and II* or the Supreme Court's in *Mobil Oil Corp. v. FPC.*

This situation is far different from one in which the Commission reopens and changes retroactively the rates set in a permanent certificate. *See, e.g., FPC v. Sunray DX Oil Co.,* 391 U.S. 9, 24, 88 S.Ct. 1526, 1534, 20 L.Ed.2d 388 (1968) ("[i]t seems incontestable that if a producer consistently sells gas at the price specified in a final, permanent certificate, and does not attempt to increase its price, the Commission may not order it to make refunds simply because the just and reasonable rate for its area turns out to be below the in-line price"). Opinions No. 546 and 546–A, rather than issuing permanent certificates, set rates that applied to *all* producers of natural gas in the Southern Louisiana area, regardless of the type of certificate under which they were operating. Despite the stay of those opinions, they were affirmed in *SoLa I,* and the producers were liable for those rates as of October 1, 1968.

Neither do we agree with Triton's argument that it cannot be forced to pay refunds for 1968–71 because it was not a party to the settlement agreement adopted in Opinions No. 598 and 598–A. Both the

Fifth Circuit in *SoLa II,* 483 F.2d at 893, and the Supreme Court in *Mobil Oil Corp. v. FPC,* 417 U.S. at 312–14, 94 S.Ct. at 2347–49, have foreclosed this argument, holding that the Commission was entitled to adopt the terms of the proposed settlement as a decision on the merits because it made an independent finding supported by substantial evidence on the record as a whole that the proposal would establish just and reasonable rates for the area. Regarding this issue, the Supreme Court wrote:

> The Commission clearly had the power to admit the agreement into the record— indeed, it was obliged to consider it. That it was admitted for the record did not, of course, establish without more the justness and reasonableness of its terms. But the Commission did not treat it as such. As we have noted, the Commission weighed its terms by reference to the entire record in the Southern Louisiana area proceedings since 1961, and further supplemented that record with extensive testimony and exhibits directed at the proposal's terms. We think that the Court of Appeals correctly analyzed the situation and stated the correct legal principles:
>
> > "No one seriously doubts the power —indeed, the duty—of FPC to consider the terms of a proposed settlement which fails to receive unanimous support as a decision on the merits. We agree with the D.C. Circuit that even 'assuming that under the Commission's rules [a party's] rejection of the settlement rendered the proposal ineffective *as a settlement,* it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits.'* . . .
>
> As it should FPC is employing its settlement power under the APA, 5

U.S.C.A. § 554(c), and its own rules 18 C.F.R. § 1.18(a), to further the resolution of area rate proceedings. If a proposal enjoys unanimous support from all of the immediate parties, it could certainly be adopted as a settlement agreement if approved in the general interest of the public. But even if there is a lack of unanimity, it may be adopted as a resolution *on the merits,* if FPC makes an independent finding supported by 'substantial evidence on the record as a whole' that the proposal will establish 'just and reasonable' rates for the area." 483 F.2d at 893. (Emphasis in original.)

The choice of an appropriate structure for the rate order is a matter of Commission discretion, to be tested by its effects. The choice is not the less appropriate because the Commission did not conceive of the structure independently.

*Mobil Oil Corp. v. FPC,* 417 U.S. at 312–14, 94 S.Ct. at 2347–49. *See also Pennsylvania Gas & Water Co. v. FPC,* 463 F.2d 1242, 1246 (D.C.Cir.1972) ("in agency proceedings, settlements are frequently suggested by some, but not necessarily all, of the parties; if on examination they are found equitable by the regulatory agency, then the terms of the settlement form the substance of an order binding on all the parties, even though not all are in accord as to the result"). Thus, the Fifth Circuit and the Supreme Court concluded that all producers of natural gas in the Southern Louisiana area were bound by the settlement agreement adopted in Opinions No. 598 and 598–A.[9]

In sum, we are convinced that the Commission had the authority to order natural gas producers in the Southern Louisiana area to make refunds for the years 1968–71. The question remains whether it exercised

---

**9.** In addition, we note that the settlement proposal was not offered only by § 4(e) producers. Triton concedes that it was proposed by a majority of the natural gas producers in the Southern Louisiana area, who offered a cash settlement in the form of refunds, including refunds of rates collected from October 1, 1968, to August 1, 1971, in return for Commission approval of higher rates than those set in Opin-

ions No. 546 and 546–A, *even though* they were operating under final, unconditioned, permanent certificates. Brief of Appellee at 29. We have no reason to believe that when the Commission adopted the settlement it *somehow* changed the agreement to relieve producers operating under final, unconditioned, permanent certificates of the refund responsibility.

that authority and, accordingly, whether *Triton* has refund obligations under Opinions No. 598 and 598–A.

### B. *Triton's Refund Duty*

██ The question of whether the Commission actually exercised its authority in Opinions No. 598 and 598–A so as to include Triton in the group of producers who have a duty under those opinions to make refunds for the period from October 1, 1968, to January 1, 1971, obviously turns on an evaluation of the language of those opinions. Ordering paragraph (A) of Opinion 598 sets out the area rates effective in the Southern Louisiana area *as of August 1, 1971.* 46 F.P.C. at 142–45. No one argues that those rates are applicable to Triton. Instead, the parties' disagreements center on ordering paragraph (B), which states:

B. The applicable area rate as defined in ordering paragraph (A) above, shall be effective from and after the effective date of this order and any amount collected in excess thereof on or after that date shall be subject to refund plus interest at 7 percent.

Refunds due after the proceedings in Docket No. AR61–2, *et al.,* Docket No. AR69–1, and Docket No. G–13221, *et al., all dockets listed in Parts III, IV or V of Appendix B,* together with all dockets in Opinion No. 575, issued March 12, 1970, shall be based upon amounts collected by respondent [10] in excess of the following prices:

(a) For deliveries prior to January 1, 1965, 20.625 cents per Mcf for onshore gas and 19.625 cents per Mcf for offshore gas.

(b) For deliveries from January 1, 1965, to October 1, 1968, 21.25 cents per Mcf for onshore gas and 20.25 cents per Mcf for offshore gas.

(c) For deliveries from October 1, 1968, to January 1, 1971, 30.5 percent of

the difference between revenues during this period based on rates prior to October 1, 1970, and the revenues resulting during this period through the application of rates established in Opinion Nos. 546 and 546–A, as modified by Opinion No. 567. This percentage factor of 30.5 may be increased as high as 33 percent, in order to bring the refund obligation in this period to within a range of one percent of $150 million dollars.

(d) For deliveries on or after January 1, 1971, the base area rates prescribed in (A)(c).

Amounts collected by the respondent, even though in excess of the prices in (a) and (b), shall not be subject to refund, to the extent they were collected pursuant to a prior settlement agreement approved by this Commission, or were not in excess of a price set out in a permanent certificate issued by the Commission, or were not in excess of the refund floor provided in an applicable temporary authorization.

*Id.* at 145.

There *is* agreement that, at a minimum, paragraph (B) explains how to calculate refund obligations for four time periods prior to August 1, 1971. The Commission asserts, however, that paragraph (B) also states which *parties* have refund obligations because it directs that "[r]efunds due" under various proceedings must be paid by respondents to those proceedings according to the paragraph's refund scheme. Triton's predecessors are listed as respondents in two of those proceedings, Docket No. AR61–2, the proceedings that culminated in Opinion No. 546, and Docket No. AR69–1, the proceedings that the Commission commenced while the courts were reviewing Opinions No. 546 and 546–A, that it ulti-

---

10. The Commission defined "respondent" in Opinion No. 598 as follows:

Where the term "respondents" is used in the finding and ordering paragraphs hereinafter set forth, it is to be regarded as referring to all named respondents in the Commission

orders issued in this case, and to all parties on whose behalf such named respondents have filed FPC gas rate schedules for sale of gas produced in the Southern Louisiana area. Opinion No. 598, 46 F.P.C. 86, 141 n. 143 (1971).

mately consolidated with AR61–2, and that resulted in Opinion No. 598. Thus, the Commission concludes, Triton is clearly obligated under the plain language of paragraph (B) to make refunds for the 1968–71 period.

In response, Triton advances several theories as to why it is *not* liable for refunds under paragraph (B). First, it contends, as the district court found, that paragraph (B) does not create a duty to make refunds, but merely sets a basis for determining how much certain producers must pay back to meet refund obligations imposed upon them as a consequence of their participation in the various proceedings listed in the paragraph. The second sentence of paragraph (B), Triton argues, does not state that *respondents* in any of the various proceedings listed in the sentence must make refunds, but instead simply states that *"[r]efunds due"* under those proceedings "shall be based" upon a schedule specified in the remainder of paragraph (B). Because it does not owe refunds under any of the listed proceedings (even though it did participate in them), Triton concludes that it has no refund obligations.

Second, Triton argues that the district court was correct when it found that it is ordering paragraph (E) of Opinion 598, not paragraph (B), which specifies *who* is required to make refunds. It does so, Triton asserts, by specifying which producers are required to file refund reports. The relevant part of paragraph (E) reads:

> By November 1, 1971, refund reports shall be filed with this Commission in triplicate, and one copy served on the buyer, by *each producer involved in one or more of the proceedings set out in Appendix B* [of Opinions No. 598 and 598–A] and as to which refunds are required under the terms of this decision.

46 F.P.C. at 146–47 (emphasis added). Because, Triton argues, neither it nor its predecessors took part in a proceeding listed in Appendix B,[11] the company is not among those producers specified by paragraph (E) as having refund obligations.

Finally, the district court found support for its view that only those producers who previously had been collecting rates subject to a refund contingency could be liable for refunds for the years prior to January 1, 1971, in the final sentence of ordering paragraph (B). It quoted that sentence as stating "that amounts collected by a respondent 'shall not be subject to a refund, to the extent that they . . . were not in excess of a price set out in a permanent certificate issued by the Commission. . . .'" J.A. at 150. Because Triton was operating pursuant to a permanent unconditioned certificate, the court concluded, it is exempted from the paragraph's coverage by that paragraph's own language.

None of these arguments convinces us that Triton is not covered by ordering paragraph (B). First, we note, as does the Commission, that the second sentence of paragraph (B) lists several proceedings under which refunds might be due. One of those proceedings is Docket No. AR61–2, the docket that culminated in Opinion No. 546, in which *all* producers of natural gas in the Southern Louisiana area were respondents. Triton, through its predecessors, was, as it concedes, a respondent in Docket No. AR61–2. As we pointed out above, all producers who were respondents in AR61–2, including Triton's predecessors, were on notice after the issuance of Opinion No. 546 that they might have to refund monies received after October 1, 1968, if they charged rates higher than those listed in that opinion. It does not seem unreasonable to us that the Commission could consider those refunds as "refunds due" under the pro-

---

**11.** Appendix B is divided into five parts. Part I lists "Respondents," *i.e.,* all persons who had "filed FPC Gas Rate Schedules for sales in the Southern Louisiana Area"; Part II, respondent pipeline purchasers; Part III, Section 4(e) dock-

ets consolidated with the initial Docket No. AR61–2 proceedings; Part IV, Section 4(e) *dockets not consolidated in the initial Docket No. AR61–2 proceedings;* and Part V, pending

ceedings in Docket No. AR61–2 for the purposes of paragraph (B).[12]

Second, after examining the language of ordering paragraph (E) and Appendix B to Opinions No. 598 and 598–A, we disagree with Triton's arguments that (1) paragraph (B) only sets forth the basis for calculating refunds, while paragraph (E) specifies who is actually required to make refunds; (2) the two paragraphs do not encompass the same proceedings; and (3) neither it nor its predecessors took part in any "proceedings" listed in Appendix B. Paragraph (E) is clearly entitled "Refund Reports" and merely identifies those producers who have to file refund reports with the Commission "as required by the terms of this decision." It is our interpretation, as well as the Commission's, that ordering paragraph (B) and Appendix B of Opinions No. 598 and 598–A refer to the same proceedings. Appendix B is not limited to the dockets consolidating filings for rate increases under § 4(e) with the main proceedings. On the contrary, Part I of the Appendix B lists the respondents in the main Southern Louisiana area rate proceedings. 46 F.P.C. at 165–68. Nothing in the language of paragraph (E) excludes these area rate proceedings from the paragraph's operation or limits its scope to the dockets listed in Parts III–V.[13] Two of Triton's predecessors-in-interest,[14] Landa Oil Company and Magna Oil Corporation,

are set out in Part I as respondents in the main proceedings. *Id.* at 167. Triton is therefore clearly a "producer involved in one or more of the proceedings set out in Appendix B." Thus, even if ordering paragraph (E) rather than paragraph (B) determined which producers have refund obligations, Triton would still be included.

Third, we do not agree with the district court that the final sentence of ordering paragraph (B) exempts Triton from any refund obligations. A close examination of the entire sentence reveals that it is intended to ensure that producers operating pursuant to permanent certificates could not be held liable for refunds *prior to* 1968, not to exempt such producers from all refund duties. Without the ellipses in the district court's quotation, the sentence states that "[a]mounts collected by the respondent, *even though in excess of the prices in (a) and (b)*, shall not be subject to refund, to the extent they were collected pursuant to a prior settlement agreement approved by this Commission, or were not in excess of a price set out in a permanent certificate issued by the Commission, or were not in excess of the refund floor provided in an applicable temporary authorization." 46 F.P.C. at 145 (emphasis added). We read this sentence to mean that if a producer had

---

Section 7(c) certificate applications. 46 F.P.C. at 165–84.

**12.** We note that the Commission added the italicized clause in the second sentence of paragraph (B), which states that *"all dockets listed in Parts III, IV or V of Appendix B"* are covered by the paragraph, to Opinion No. 598 in Opinion No. 598–A. 46 F.P.C. 633, 640 (1971). Because the dockets listed in Parts III and IV of Appendix B refer to § 4(e) proceedings, this new clause specifically brought them within the refund provisions of paragraph (B). Triton now contends, however, that the *only* producers who have to make refunds are those involved in § 4(e) proceedings. If we accepted Triton's interpretation, the refund provisions of Opinion No. 598 (before it was amended in Opinion No. 598–A) would not have covered any producers—an illogical reading at best. It is more sensible to read this amendment as an attempt on the Commission's part to make it absolutely clear that paragraph (B) *also* covered the § 4(e) proceedings (among others), *not* that they were its only focus.

**13.** Triton appears to argue that because Appendix B only lists "respondents" to the Southern Louisiana area rate proceedings and does not specifically list the AR61–2 proceedings themselves, those proceedings do not fall within the language of ordering paragraph (E). Thus, Triton concludes, only the producers listed in Part III of Appendix B, which were involved in § 4(e) proceedings, meet the test of paragraph (E). Triton fails to convince us that the Commission did not include the AR61–2 proceedings in Appendix B by listing the AR61–2 respondents in Part I. This is particularly so given the fact that Part III of Appendix B itself refers to the AR61–2 proceedings in its title, "Section 4(e) Dockets Consolidated with the Initial Docket No. AR61–2 Proceedings," and also does not use the word *proceedings* when it lists the producers in the § 4(e) dockets.

**14.** See FERC Brief, Appendix B, tracing the "Chain of Ownership of Triton's Rate Schedules."

**1462**

been charging rates pursuant to a permanent certificate prior to 1968, as Triton had, it did not have to refund payments collected under rates in excess of those listed in subparagraphs (a) and (b). Since those two subparagraphs set rates (and thus refund obligations) for the years prior to 1965 and for January 1, 1965, to October 1, 1968, Triton owes no refunds for those periods. The sentence does not apply to obligations for the years after October 1, 1968, the time periods described in subparagraphs (c) and (d), and does not exempt respondents who were collecting rates subject to permanent authorization from the refund obligations set out in those latter two subparagraphs. In sum, the sentence limits Triton's refund obligations to the time periods covered by subparagraphs (c) and (d), an outcome in line with the obligations imposed by Opinions No. 546 and 546–A.

Finally, our interpretation is supported by a Commission order issued sixteen months after the effective date of Opinion No. 598. *Area Rate Proceeding . . .*, 48 F.P.C. 980 (1972). In this order, the Commission explicitly interpreted Opinion No. 598 to require refunds for the period from October 1, 1968, to January 1, 1971, whatever the nature of the certificate under which a producer was collecting its charges:

> Refunds, with interest, should be computed for the October 1, 1968, through the December 31, 1970, period . . ., even if the rate in question was collected pursuant to a prior settlement agreement, a permanent certificate, or a temporary certificate containing a refund floor above the applicable Opinion No. 546 rate. The last paragraph in Ordering Paragraph (B) of Opinion No. 598, 46 FPC at 145, has no applicability to deliveries made on or after October 1, 1968, and thus producers in the above situations are not relieved of refund obligations for the period commencing October 1, 1968.

*Id.* at 982. While it is true, as Triton points out, that this subsequent order is not itself determinative of the proper interpretation to be given to Opinion No. 598, it does carry some weight. Issued shortly after Opinions

No. 598 and 598–A, it affords a reasonably contemporaneous view of what the Commission actually intended to accomplish in those opinions. Certainly, we are entitled to give deference to an agency's construction of its own opinions and orders—especially in the complex area of ratemaking. *See, e.g., Florida East Coast Railway Co. v. United States*, 259 F.Supp. 993, 997 (M.D. Fla.1966), *aff'd per curiam*, 386 U.S. 544, 87 S.Ct. 1299, 18 L.Ed.2d 285 (1967). We do so here and conclude that Triton is subject to the refund obligations of subparagraph (c) of paragraph (B) of Opinion 598.

### IV. CONCLUSION

For the foregoing reasons, we reverse the order of the district court summarily dismissing the Commission's claim for injunctive relief against Triton. Because Triton may have other defenses to the injunctive relief the Commission has requested, however, we remand for further proceedings.

*It Is So Ordered.*